IN RE PROBATE OF WILL OF ELIZABETH CRISSICK, Deceased. EDWARD DAVIS et al., Proponents and Appellees, v. JAMES M. DAVIS et al., Contestants and Appellants.

APPEAL AND ERROR: Review—Favorable Construction of Evidence. Rule recognized that, on review of the direction of a verdict, the defeated party has the right to have the testimony introduced construed as strongly in his favor as reason will permit.

WILLS: Validity—Undue Influence—Advice and Solicitation. Under the general rule that advice and solicitation, *no matter how insistent they may be,* will not constitute undue influence unless it be further shown that the freedom of the testator's mind was overcome thereby, evidence reviewed, and *held* insufficient to carry to the jury the question of the invalidity of the will by reason of the coercion and domination of the husband of testatrix.

WILLS: Validity—Undue Influence—Declarations of Testator—Purpose for Which Admissible. Declarations that a particular will was procured by fraud or undue influence, and that certain persons are, or have been, the object of testator's affection or dislike, are hearsay as to the substantive fact asserted, but are admissible as either circumstantial evidence or as a statement of mental condition, and admissible as an exception.

APPEAL AND ERROR: Harmless Error—Non-effect in Changing Result. Sustaining the rulings of the trial court is justified when, had the rulings been otherwise, the result would have been the same.

WILLS: Validity—Undue Influence—Evidence—Intemperate Habits, Conduct and Language of Coercer. That the husband drank much, *and at such times* did not use the wife and her sister right, and would swear at them, and that, under these conditions, the wife was afraid of him, is immaterial on the issues whether the testatrix was mentally incapable to make a will, or whether the will in question was the will of the husband rather than of the wife, there being no evidence that, at the time, or shortly before, the will was executed, the husband had been drinking, misusing his wife and sister-in-law, or swearing at them.

EVIDENCE: Opinion Evidence—Conclusions—Fear. One may, from the very necessity of the case, testify, when material, that another person on a named occasion "appeared to be in fear",

but not that such person *was* in fear. The distinction is between permitting the witness to give his deduction solely from the physical appearance of such other person, and permitting him to involve and combine therewith what necessarily must have been told him by the one in fear.

**EVIDENCE:** Opinion Evidence—Conclusions—Fear of Named Person—Necessity for Detail of Facts. One may not give his conclusion that another person appeared to be in fear *of a particular person* without first detailing the facts upon which he bases his conclusion—for instance, the actions and conduct of such particular person.

**APPEAL AND ERROR:** Review—Exclusion of Question—Necessity to Show Prejudice. He who has his question to a witness excluded should make an offer as to what he expects to prove, the purpose not otherwise appearing.

**APPEAL AND ERROR:** Review—Failure to Advantage One's Self of Ruling. A ruling of the court will not be reviewed when the complaining party fails to take advantage of a subsequent ruling reversing the first.

**WILLS:** Validity—Undue Influence—Evidence—Reluctance to Talk in Presence of Husband—Declarations of Testatrix. Declarations of testatrix as to why she would not talk about her business affairs in the presence of her husband, who was charged with exercising undue influence over her, are not admissible *to prove such undue influence.* So *held* where the testatrix gave as reasons for not so talking in the presence of her husband that "he would not allow her to do as she wanted to", and "would not allow her to talk about her business when he was there."

**APPEAL AND ERROR:** Review—Exclusion of Question—Necessity to Show Prejudice.

**WILLS:** Validity—Undue Influence—Declarations of Testatrix—Mental Condition. Declarations of testatrix as to why she would not talk about her business affairs in the presence of her husband, who was charged with exercising undue influence over her, might be admissible as bearing on the mental condition of testatrix, depending on the nature of the declaration.

**WILLS:** Validity—Undue Influence—Evidence—Reluctance to Talk in Presence of Husband—Declarations of Testatrix.

**WILLS:** Validity—Undue Influence—Declarations of Testatrix—Mental Condition.

**APPEAL AND ERROR:** Review—Exclusion of Question—Necessity to Show Prejudice.

**APPEAL AND ERROR:** Review—Rulings on Indefinite Questions—Refusal to Reframe Question. A question indefinite in form should, on request of the court, be reframed.

**EVIDENCE:** Opinion Evidence—Conclusions—"Boss of the Family." No witness may give his conclusion as to who was "boss" of a family—who habitually had his own way. Such matter, if material, can only be arrived at by a detail of facts, leaving the jury to draw its own deductions.

**EVIDENCE:** Opinion Evidence—Conclusions—Knowledge of a Fact—Wills. The conclusion of a witness that a testatrix did not *know* that a will was going to be made at a certain time is inherently incompetent.

**APPEAL AND ERROR:** Review—Exclusion of Objectionable Evidence on Inadequate Objection. The court will not review an assignment of error based on the exclusion of evidence objectionable in fact, even though there was no objection at all, or the one made was inadequate.

**WILLS:** Invalidity—Effect on Prior Will. The setting aside of one will does not result in intestacy when an unquestioned prior will exists.

*Appeal from Jones District Court.*—F. O. ELLISON, Judge.

SATURDAY, FEBRUARY 19, 1916.

TRIAL on objections to probate of will. Verdict for proponents by direction of the court. Contestants appeal.—*Affirmed.*

*Jamison, Smyth & Gorman,* and *Barnes & Chamberlain,* for proponents.

*Remley & Remley,* and *E. A. Johnson,* for contestants.

SALINGER, J.—I. The objections made, as defined by the brief of appellants, are: (1) That by reason of the great age of decedent, 89 years, her mind was enfeebled; that for many years she had been afflicted with a bodily ailment which also affected her mind, so that she did not have mental capacity sufficient to understand the nature of the transaction and to execute a will; (2) that decedent was under the complete control of her husband; that he exercised undue influence

over her by which her will was overcome; that she had no exercise of a free will on her part; and that the alleged will was caused to be executed by the husband fraudulently, and for the purpose of preventing deceased from disposing of her property as she saw fit.

At the close of all the evidence, the proponents moved that the court direct the jury to return a verdict for the proponents upon the grounds: (1) That there is not sufficient evidence to warrant submission to the jury; (2) that contestants have admitted in the record that the instrument proposed for probate was duly executed and signed as required by law. The court sustained the motion. An assignment presents that this was error. Others present exclusions of offered testimony.

II.   Addressing ourselves to the testimony which was put in, and applying the rule that, on review of the direction of a verdict, the defeated party has the right to have the testimony introduced construed as strongly in his favor as reason will permit, we find: First, that we must eliminate much testimony which is inherently incompetent. For instance, no one but decedent or her husband can say that *whenever anything* came up, the husband would settle what should be done. No one but decedent can say that nothing was *ever* said to her, or that she *at no time* knew of certain things, and the like. So subtracting, the evidence is this:

1. APPEAL AND ERROR: review: favorable construction of evidence.

The husband was 88 years old when the alleged will was executed; his wife, a little younger. He was overbearing in disposition and in the treatment of his wife, was gruff, had a loud voice and was very profane and rough in language, swore in the presence of ladies and concerning the most serious of matters. When he was in the house, he did most of the talking. He would not let her talk about her business when he was present. When anything came up, he would say what was to be done and would say that was the

2. WILLS: validity: undue influence: advice and solicitation.

end of it.  He wouldn't let her do as she wanted to.  She usually kept still; had nothing to say.  She was unable to tell from her bank book how much money she had in the bank. He had charge of her money matters and would go to her for money.  He was grasping for money, and, if he wanted any at any time, he always got it.  He signed her name to contracts as her agent and collected the interest and rents.  He charged her for what he did for her.  She was feeble, weak, gentle and of retiring disposition, while he was burly, loud-talking and grim.  She was hard and dull of hearing, and one had to speak clear in order to make her hear at all times.

A witness who had opportunities for observing said that he knew of no general breakdown in her during the last 10 years of her life, unless it were her memory; that this was not as bright in the last few years as it was years ago; that he cannot tell when he first observed a change in this regard and was not with her often enough to observe; that she was just like other people when she got old; that she failed a little in the last few years, as people do with reference to their memory as they get older; that the change was that her mind wasn't just as clear; that she wasn't active; and that, during the last two years of her life, she was very feeble.  She would often start to the pantry for a cup or something for dinner and forget what she went out to get, and maybe get something else, and returned to the kitchen without recalling what she went after.  This happened quite often at meal times, and grew worse as she got older.  She would give several dishes of the same kind of food to persons at the table and would put her notes and things in boxes and displace them about the house.  When the witness saw her next, after he had been present at the execution of the alleged will, he had to tell her who he was, because she didn't appear to know him.  She would often call him Milt, which is the name of his brother, and sometimes she wouldn't notice when people came in and wouldn't know them and couldn't call their names right.  After this

witness had declared that he did not know whether being childish meant being forgetful or hard to get along with, and had inquired whether it did consist of these, he said that decedent was forgetful and childish in her talk and actions, and that this increased as she got older, but that he would not say that she was real childish in any way more than any other old person would be. She often had heart spells. With advancing years these were perhaps more frequent in recurrence, and they became harder each year and affected her worse each time. She had one of these spells a few hours before the making of the will and always lay on a couch when she had them. On the morning of the day on which the will was made, she lay on the couch about an hour. These spells generally left her rather nervous and weak, and she was weak on the day that the will was executed. When the scrivener came, she looked as though she was weak, tired out and nervous, and said that she didn't know whether she could write, and the scrivener placed the pen in her hands and his hand upon hers and moved it along, thus causing the signing of her name. The morning after the will was made, she was uncertain what she had signed, and was very much worked up and excited. She said then that she could not do as she wanted to because her husband would not let her, and she was crying and nervous; said that she was not satisfied with her will; that her husband wanted it, and that she and he made it. She complained that he would not allow her to do as she wanted to. She told Hasty that her husband would not allow her to do as she pleased; that she could not do as she wanted to because he would not let her; and she told Mrs. Milner that the will did not suit her.

In the old will, the first item gives to the husband one half of his wife's property absolutely. A codicil modifies this to the extent of deducting from this half $2,050. Both this will and the codicil were made very early in the year 1903. The will in suit was made on January 18, 1911, something

like eight years later. The first item in the new will gives the husband one half, but does not make the deduction effected by the codicil to the earlier will. Item 2 is alike in both wills. It gives the husband for his life the net annual income of the half which is not devised to him absolutely. The wife made no objection to the one change thus far accomplished—to relieve the half absolutely bequeathed from the charge of $2,050 to which it was subjected by the codicil to the earlier will. For aught that appears, testatrix may not have remembered after eight years that there had been such a subtraction in the earlier will, or the reasons that dictated the subtraction may have ceased to exist during these eight years. Item 3 in the old will gave Ed. Davis $2,000. The new will gives him $1,000. The testatrix made no objection to this change, nor does it appear that the husband said anything whatever to induce her to consent to such change. The evidence merely shows that the change was dictated in her presence, without objection on her part. Item 4 in both wills gives to Eliza Fountain, Bert and Lucy Milner, to Lucy Chamberlain, and, respectively, to the Methodist and the Presbyterian Church of Wyoming, and to Naomi Eastman, the sister of the decedent, each $500. It is not significant that testatrix made no objection to a rewriting of these seven bequests of $500 each; and certainly no influence was exercised to make her adhere to the older will in these seven respects, and there is nothing to indicate why she should wish or that she desired to make a change as to these. It is a fair presumption that she remained silent as to these because she was satisfied to have the old will thus duplicated. In the older will, J. M. Davis was not mentioned. When the point at which these $500 bequests were repeated had been passed, the testatrix, for the first time, took an affirmative part, which, while it proves that she had not spoken before, also proves that there was nothing to interfere with her speaking, had she so desired. She made the suggestion that she wished J. M. Davis to have a $1,000 be-

quest, the same amount as the one given to Ed. Davis in the new will, all of which indicates, for one thing, that she had a thorough understanding of what was being done with the new will, and approved of reducing Ed. from $2,000 to $1,000, and of making a change by making J. M. Davis a legatee in some amount. At this point, the husband said that J. M. Davis should not have more than $500; it should be that or nothing; and the testatrix remained silent. It does not appear that this was due to any fear of the husband, and it appears, as said, that she was not in fear in making the suggestion that she did make. It does not appear why she remained silent when the husband insisted that the legacy to J. M. should not be larger than $500. It is fair to assume that she yielded to the judgment of her husband as to a matter on which she had no very insistent desires, for she did not give J. M. Davis anything in the older will; and here, the husband, who is supposed to be hostile and dominating, takes the initiative in making J. M. Davis a legatee. It could not have been her purpose earlier to make J. M. Davis a beneficiary, because she made the codicil to the earlier will when the husband was not present, and she was as much at liberty to change her earlier will by remembering J. M. Davis in it at that time as she was to put into the codicil what she did have put into it. The only other material change is that, in the first will, legatees Ed Davis, Eliza Fountain, Bert and Lucy Milner, Lucy Chamberlain, Naomi Eastman, and the two said churches, were made residuaries, each to take one sixth of the residuary estate; while in the new will, Ed. Davis, the additional legatee, J. M. Davis and Eliza Fountain are made the sole residuary legatees. If it can be said that the husband acted in hostility towards J. M. Davis, and that this supplies a motive for exercising influence on the sole point on which the husband asserted himself strongly, it can be answered that it was at his suggestion that J. M. Davis became a legatee in $500 and a residuary to the extent of one third, when he had nothing in the earlier will.

3.

It is not intended to say that some one or more specific decisions in terms sustain the conclusion we reach. Fact decisions are very rarely precise precedents. But they do afford the possibility of deducing general rules from them. Thus limited, the cases sustain affirmance.

On the whole, *Perkins v. Perkins,* 116 Iowa 253, upholds a will against stronger evidence of weak mental condition than, and as strong evidence of influence as, is present here. On page 262, we say that, even if it were clearly shown that a wife requests her husband to make the will in her favor and that he would not have made it but for her importunity, it would still be insufficient ground for setting it aside; that, to be undue within the meaning of the law, the influence must be such as to subject the will of the testator to that of the person exercising such influence, and make the paper express the purpose of such person, rather than that of testator himself; that it must be equivalent to moral coercion, and such inducing influence must be directly connected with the execution of the will, and operate at the time it was made. In *Henderson v. Jackson,* 138 Iowa 326, a demurrer is sustained to objections to the probate of a will that, at the date of the will, testatrix was the widow of one P, who had died four years before; that, prior to the last named date, testatrix, at the instance and direction and under the influence of her said husband, made and executed a will by the terms of which she devised and bequeathed her entire estate to the heirs and relatives of the husband, ignoring her own lawful heirs and blood relatives; that, after the death of her husband, testatrix executed the will now in controversy for the purpose only of compensating those of her relatives who had cared for and nursed her during her last sickness and in consideration thereof; and that she desired to and would have revoked the provisions of the first will entirely and given her property to the members of her own family if it had not been for the promise exacted of her by her husband when on his deathbed

to give the same to his heirs and relatives; that under the hallucination that this promise was binding on her, and her belief that she was powerless to change the will which he had dictated, and that she would suffer the displeasure of her husband in the future if she failed to carry out his wishes, she was induced to make the will offered for probate, and thereby disposed of her property to the exclusion of her own heirs, which she would not have done but for the inducing influence thus exercised over her. In *Speer v. Speer,* 146 Iowa 6, withdrawal from the jury is upheld, on evidence that testator had been seized with a disease five days before the will was executed, of which he died two days after its execution. Only two witnesses saw him on the day that the will was executed. They spoke of his physical weakness and his failure to recognize them, and his apparent inability to converse as to his condition or his affairs. There was testimony that his breath was labored and that he could not indicate that he understood what the witnesses said to him, and that he seemed to be suffering, seemed to be in a stupor, and did not talk to witness that day because he was too sick. And in *Gates v. Cole,* 137 Iowa 613, 617, we said:

"It may be conceded that the evidence shows opportunity for undue influence; but the opportunity shown is no greater than should be present in all such cases if the child possess the love which the relationship demands, and opportunity alone is wholly insufficient to establish undue influence. . . . Even advice and solicitation, no matter how insistent they may have been, will not make a will invalid, unless it be further shown that the freedom of the testator's will was overcome thereby."

In *Children's Aid Society of New York v. Loveridge,* 70 N. Y. 387, a case of contest on the ground of undue influence, on page 394, the court said:

"In order to avoid a will, upon any such ground, it must be shown that the influence exercised amounted to a moral coercion, which restrained independent action and destroyed

free agency, or which, by importunity which could not be resisted, constrained the testator to do that which was against his free will and desire, but which he was unable to refuse or too weak to resist. It must not be the promptings of affection; the desire of gratifying the wishes of another; the ties of attachment arising from consanguinity, or the memory of kind acts and friendly offices, but a coercion produced by importunity, or by a silent, resistless power which the strong will often exercises over the weak and infirm, and which could not be resisted, so that the motive was tantamount to force or fear.''

Keeping in mind the inherent limitations of case law on such a question as we have, we are sustained by *In re Estate of Townsend,* 128 Iowa 621; *Hanrahan v. O'Toole,* 139 Iowa 229, and *Brackey v. Brackey,* 151 Iowa 99. That is to say the wills in these cases were upheld on evidence which, while it differs from that here, in being stronger against the will on some points and weaker on others, on the whole makes as strong a case for the contestants as is made in this case.

To be sure, in *Sevening v. Smith,* 153 Iowa 639, we held the sanity to be a jury question. But this again discloses the difficulties in the way of fact precedents. We would so hold here on facts like those in *Sevening's* case.

It is true, too, that in *In the Matter of Probate of Will of Selleck,* 125 Iowa, at 680, and in *Johnson v. Johnson,* 134 Iowa, at 35, we hold that an earlier will is admissible on undue influence, and such an one was put in in the case now in hearing. But neither this law holding nor the fact that such evidence is in makes a case for the jury on whether here undue influence was exercised, and whether the will is that of the alleged testatrix.

And so of other citations. They declare good law, but do not make a jury case for these contestants. Seven rule that, on undue influence, declarations of testator are not admissible to prove the matter declared, but are admissible on the mental condition of declarant. So does Schouler, Wills, Sec. 243.

Wigmore, Evidence, Sec. 1738, says that declarations that a particular will was procured by fraud or undue influence, and that certain persons are or have been the object of his

**3. WILLS: validity: undue influence: declarations of testator: purpose for which admissible.**

affection or dislike, are hearsay as to the substantive fact asserted, but are admissible as either circumstantial evidence or as a statement of mental condition, and admissible as an exception. And see *Johnson v. Johnson,* 134 Iowa 33; *Muir v. Miller,* 72 Iowa 585; *In re Estate of Kah,* 136 Iowa, at 120; *Vannest v. Murphy,* 135 Iowa 123; *Shailer v. Bumstead,* 99 Mass. 112; and *In re Last Will of Hollingsworth,* 58 Iowa, at 528. Nor is it controlling that we held, in *Dye v. Young,* 55 Iowa, at 435, that declarations are receivable to rebut the claim of undue influence. Five cases cited declare the general rule as to when verdicts should not be directed. Two more announce it, and add, respectively, that, on motion to direct, preponderances may not be weighed, nor conflicts settled.

III. As to the exclusions complained of, they might well be disposed of by a holding that, though the rule in *Campbell v. Park,* 128 Iowa 181, be applied, the result would not be

**4. APPEAL AND ERROR: harmless error: non-effect in changing result.**

changed; that there would be no case for a jury if what was excluded be considered. But there is possibly enough doubt as to this to justify us in considering the assignments upon these exclusions.

Answers to Interrogatories 11 to 14, propounded to Naomi Eastman, were excluded on objection that the inquiry was incompetent, irrelevant and immaterial.

**5. WILLS: validity: undue influence: evidence: intemporate habits, conduct and language of coercer.**

No. 11 was: "State what was the habit of Mr. Crissick as to drinking." Answer. "He drinked so much."

No. 12. "When he had been drinking, what was his treatment of his wife and yourself?" Answer. "Well, he didn't use us right."

No. 13. "What would he do or say then?" Answer. "Oh, he would seem to swear at us so."

No. 14. "State whether or not Mrs. Crissick was afraid of him at such times." Answer. "Yes."

Numbers 11, 12 and 13 are vulnerable to the objection made that they cover immaterial, if not also irrelevant, matter. It was no evidence that deceased was not mentally capable, to make a will, nor that the will in suit was the will of the husband, rather than of the wife, that the husband drank much, didn't use the wife and her sister right, and that he would swear at them.

### 2.

The answer "Yes" to Interrogatory 14 must be read in connection with the answers to 11, 12 and 13. Thus read, it is testimony that, when the husband drank, he did not use his wife and her sister right, and seemed to swear at them. His wife was afraid of him. It seems to us that this is immaterial and irrelevant, because there is no evidence that the conditions which caused such fear were operative at or shortly before the assailed will was made; no evidence that at the time, or shortly before, the will was executed the husband had been drinking, misusing wife and sister-in-law, or swearing at them. Even if the witness may testify that under stated conditions there was such fear, it is not permissible if there be no evidence that these conditions existed at the time to which the investigation is to be directed. We think, too, that the inquiry was incompetent.

It is permissible to say that, when the witness saw the party, he had the appearance of being in fear. That is a conclusion, but admissible of necessity. It gives to the jury a single deduction from physical *indicia* which it might be very difficult to describe. But this is no reason for letting in deductions which are more than single, and which tell more

6. EVIDENCE: opinion evidence: conclusions: fear.

than the impression given by physical appearance. For aught that is said, the witness may never have seen the husband under the influence of liquor, and may be giving her mere deduction that she saw deceased when she appeared to be frightened, that the fear was due to conduct caused by drinking, and was fear of the husband. A statement of a sister that, when her brother-in-law had been drinking, and had misused his wife and her (witness), and seemed to swear at them, the wife was not only frightened but afraid of the husband, is not a naked statement that at some specified time when witness saw the wife she appeared to be frightened. In the very nature of things, such an opinion must in some measure depend on what was told the witness by the one in fear.

2.

It is urged that it was error not to let the witness Hasty say whether decedent appeared to be afraid of Mr. Crissick. We have no way of knowing what the answer would have been. It might have been that she did not so appear, in which event the exclusion would be harmless. And, while it is competent for a witness to say that another appeared to be frightened, it is another thing to have it stated. as matter of opinion that he appeared to be afraid of a particular person. That cannot be revealed by mere appearance; there is nothing in the appearance of fright to indicate that it is felt as to some particular person not present on the scene. The conclusion that there was fear of a named person must rest upon some declaration of one other than witness. In that event, testimony that A appeared to be afraid of B is incompetent for being hearsay. Without claim that anything was said by the one claimed to be in fear, the testimony is a pure conclusion as to something concerning which the facts can be put before the jury; that is to say, the

7. EVIDENCE: opinion evidence: conclusions: fear of named person: necessity for detail of facts.

8. APPEAL AND ERROR: review: exclusion of question: necessity to show prejudice.

jury should be told the facts upon which the witness bases his conclusion that another was afraid of a particular person. Appellee suggests that the objection to this was not sustained, the record being this:

9. APPEAL AND
ERROR: review:
failure to ad-
vantage one's
self of ruling.

"Q. Mr. Hasty, at these times you have mentioned, did she appear to be afraid of Mr. Crissick? (Objected to as the conclusion and opinion of the witness, and not facts.)   The Court: He may describe her appearance, how she appeared, and what was done and said. (Contestants except.)"

We find this claim to be inaccurate. While this, found on page 23 of the abstract, seems not to be the sustaining of objection, it appears on abstract page 20 that the question was asked, "Did she appear to be afraid of Mr. Crissick?"; that this was objected to as incompetent, irrelevant and immaterial, and the objection sustained. This is not proof that what appellant complains of did not occur, but shows, at most, that later a similar question was asked; that the second ruling was a change of position; that it permitted answer to what had not before been allowed to be answered; and that appellant did not take advantage of the permission, and therefore may not complain of the first ruling.

3.

Mr. Hasty testified that testatrix talked to him about her business matters quite frequently. He added that she would not talk to him about them in the presence of her husband. He was then asked: "Did she ever say anything to you why she did not?" This was excluded on the objection that it was incompetent. It does not appear whether she ever did make any such explanation. The question leaves it open whether she did or not. For aught that appears, the witness might

10. WILLS: valid-
ity: undue
influence:
evidence: re-
luctance to
talk in pres-
ence of hus-
band: declara-
tions of tes-
tatrix.

have answered that she never did. There is no offer to prove anything by this interrogatory. There is

11. APPEAL AND ERROR: review: exclusion of question: necessity to show prejudice.

nothing in the record to indicate how it would have been answered had answer been permitted.

Waiving that for the purpose of argument, if we assume that the witness would have said that decedent did say something to him about why she did not talk about business in the presence of her husband, we cannot know what that "anything" would have been. Waiving that, in turn, and for the sake of argument, the witness could have done no more than say that decedent made some declarations on that subject. It seems to us that, under well-settled rules, this would have been no evidence of undue influ-

12. WILLS: validity: undue influence: declarations of testatrix: mental condition.

ence. While admissible to show her mental condition, whether the imagined statement by her was relevant on mental condition would depend upon the nature of the declaration; and we have no way of knowing whether it would have been of a character to impugn her mentality. In other words, if admissible at all, it was to show by the nature of the declaration made what the mental standing of the declarant was. A thousand declarations on this subject could have been made which would not have had the slightest tendency to prove a deranged mental condition.

## 4.

It appears that the testatrix frequently talked with witness Hasty about the will in contest, and that in talking about matters things came up, and that she mentioned it quite often.

She said that she was not satisfied with the

13. WILLS: validity: undue influence: evidence: reluctance to talk in presence of husband: declarations of testatrix.

will; that John wanted the will that way, and he made it. At another time, she said that she couldn't do as she wanted to because Mr. Crissick would not let her. Then the witness was asked: "Did she appear to be afraid of

Mr. Crissick?'' Objection was sustained that this was incompetent, irrelevant and immaterial. Nevertheless, the witness answered: ''Before she made the will she talked with me in regard to Mr. Crissick not allowing her to do as she wanted to.'' Then came the question, ''What did she say at these times?'' This was objected to as incompetent, irrelevant and immaterial, calling for declarations, hearsay and not facts, and the objection was sustained. What has been said on the ruling last considered as well covers this exclusion. It could bear on mental condition only, and we cannot know that its character was such as to be evidence on such condition. Moreover, the witness did later testify that Mrs. Crissick did say something why she talked to him this way at these times, and told him that she wanted to talk to him when Mr. Crissick was not there because she couldn't talk when he was there; that he would not let her talk about business when he was there, which seems to be a fair approach to answering what she did say at these times, or at least sufficient for presuming that this was all, and for not presuming that, if the witness had been allowed to answer, he would have given more of her sayings. And it appears on page 20 of the abstract that in answer to the question whether Mrs. Crissick appeared to be afraid of her husband, and though objection thereto was sustained, the witness said: ''Before we made the will she talked with me in regard to Mr. Crissick not allowing her to do as she wanted to,'' and then came the question, to which objection was sustained, namely: ''What did she say at these times?''

*14. WILLS: validity: undue influence: declarations of testatrix: mental condition.*

5.

Mrs. Margaret Henderson stated that she was on friendly terms with the Crissicks. She was then asked: ''Q. Did Mrs. Crissick ever say anything to you about doing what Mr. Crissick said?'' To this proponents objected that it was in-

competent, irrelevant and immaterial, and calls for the declarations of the deceased prior to the execution of this will. The court said: "I don't know when it was from the question. Change the question. I will sustain the objection." The question was not changed, nor reput; and there was no answer. Once more, we have no way of knowing whether, if answer had been allowed, anything material would have been put into the record. It is quite possible that the answer would have been that Mrs. Crissick never did say anything on the subject inquired about. At any rate, the suggestion of the trial judge should have been followed and a ruling taken on the reframed question. At the utmost, nothing but some declarations of the deceased as to her obedience to her husband could have been narrated in answer. These would not prove undue influence. If the declarations were of certain character, they might have borne on mentality. We have no means of knowing that the declarations, assuming that there were any to give, would have had that bearing.

**15. APPEAL AND ERROR: review: exclusion of question: necessity to show prejudice.**

**16. APPEAL AND ERROR: review: rulings on indefinite questions: refusal to reframe question.**

## 6.

Eastman was asked: "Who was the boss of the family, Mr. Crissick or Mrs. Crissick, if either?" To this, an objection that it was incompetent, irrelevant, immaterial and called for the opinion of the witness was sustained. The answer in the deposition was: "Mr. Crissick." The next question was: "When there was a dispute between them as to what should be done, state which one had their way." Same objection, ruling and exception. The answer was: "Mr. Crissick has his way."

We know of no rule of evidence which permits a lay witness, or any witness, for that matter, to dispose of such

**17. EVIDENCE: opinion evidence: conclusions: "boss of the family."**

interrogatories by an opinion. It is not within the exceptions which permit testimony concerning health or illness, excitement or the absence of it, appearance, and the like. It calls for a deduction by way of opinion from the conduct of parties and much else as to which of the two, if either, was boss, and, when disputes arose, which one had his way. The rule which permits conclusions of the character named rests upon the practical impossibility of putting the facts upon which they rest before the jury. That is not so of this line of inquiry. If witness knew of any, she could detail acts of ''boss-ship,'' and disputes had, and what was done or not done with reference to the matter in dispute.

## 7.

Another error is described by the appellant in his reply as a refusal to permit the witness Eastman to testify that Mrs. Crissick did not know before the will was made that it was going to be made at that time, on objection that it called for her opinion and conclusion. It is true that this question, which was answered, that testatrix did not know because they came to the house before ''ary'' one knew it, is a conclusion concerning which basic facts cannot well be given. But, while admissible under that exception, the answer was rightly excluded because it is an opinion which is inherently incompetent. No one can competently say that another was ignorant before a will was made that it was going to be made at a stated time. It is true that ''whether one has knowledge of an event is a fact and not an opinion.'' But it does not follow that B may say for A, or that anyone but A can say, that A lacked such knowledge. It is impossible that this sister can competently know that the testatrix was thus in ignorance. It is said that proponents did not object to the deposition on the ground that the witness was incompetent to testify. But they did make the objection that it

18. EVIDENCE: opinion evidence: conclusions: knowledge of a fact: wills.

called for her opinion and conclusion. Manifestly, this is an objection to her being permitted to give such an opinion and conclusion.

If matter is, in fact, objectionable, and the court excludes it, it does not matter that objection was not more specific, or that none was interposed. The text of an objection becomes material only if the objection is overruled, and error assigned upon such ruling. There the appellate court sustains the trial court upon the theory that, if the reason presented on appeal had been disclosed to the trial court, the ruling might have been otherwise, and no occasion for an appeal have arisen. But, where the court sustains an objection, and there are, in fact, good grounds for so doing, there will be no reversal because good reasons or full reasons were not presented below. Where the trial judge rules right, although not argued into it, the right ruling will not be disturbed because it was reached without presentation of the true argument for the ruling.

19. APPEAL AND ERROR :-review : exclusion of objectionable evidence on inadequate objection.

We do not see that our opinion on these exclusions is militated against by the fact that four cases cited hold that statements such as that a person's manner was angry or excited, or he was sick, or acted in a childish manner, are not to be excluded as conclusions, and one that, in the contest of a will, a nonexpert witness who has detailed the facts upon which his conclusion is based may state his opinion of the testator's soundness of mind.

IV. We are not persuaded by the argument of appellee that, if we should reverse, and a jury should thereafter sustain this contest, it would force Elizabeth Crissick into intestacy. In the first place, we have no concern with consequences that will flow from our doing our duty. Were there evidence to take undue influence to the jury, reversal would be required if Mrs. Crissick had never made a will. In the next, if the will in contest were set aside, intestacy would not

20. WILLS : invalidity : effect on prior will.

result. There is still the earlier will, as modified by the codicil. No one attacks it; it is presumed to be a lawful will; and contestants have put both the will and the codicil into evidence on the claim that they are a standard, the departure from which affords evidence of want of mental capacity, and of the exercise of undue influence.

We reach decision because firmly persuaded that, if a verdict had been taken, and it were against this will, such verdict would have no support better than a scintilla, and that it would have been the duty of the trial court to set it aside.

The judgment below is—*Affirmed.*

Evans, C. J., Ladd and Gaynor, JJ., concur.