### IN RE ESTATE OF M. F. KOLL.

**WILLS: Testamentary Capacity—Nonjury Question.** Testimony tending to show a material decline in the mental powers of a 91-year-old testatrix, owing to senile dementia, a substantial time both *before* and *after* the execution of a will, presents no jury question on the issue of testamentary capacity when the uncontradicted testimony shows that, at the very time the will was executed, she clearly understood the nature of her act in executing the will. (See Book of Anno., Vol. 1, Sec. 11846, Anno. 39 *et seq.*)

**Headnote 1:** 40 Cyc. p. 1331.

*Appeal from Webster District Court.*—H. E. FRY, Judge.

NOVEMBER 24, 1925.

THE probate of an instrument presented as the will of deceased was resisted on the ground that the deceased was of unsound mind. There was a verdict for the contestants, and an order denying probate. The proponents appeal.—*Reversed.*

*Price, Burnquist & McCall,* for appellants.

*Mitchell, Files & Mulholland* and *Wright & Cavanaugh,* for appellees.

VERMILION, J.—The only question presented is one of fact,—the sufficiency of the evidence to sustain the verdict.

The testatrix was a woman over 91 years of age at the time she executed, in June, 1918, the instrument offered for probate as her will. She was familiar with the German language, and she and her husband had used it in the family. Her husband had died in 1915. She had had eleven children. The will gave $300 to the pastor of a Catholic church in Ft. Dodge, to pay any indebtedness on the church property; $5.00 to the widow and $200 to the daughter of a deceased son; $200 to each of six children of a deceased daughter; $200 to the widow and $10 to each of the three children of another deceased son; and all the remainder of her estate to six living children, five sons and one daughter, share and share alike. The grandchildren to whom legacies were given were named in the will, and they are the contestants. After the death of her husband, she had conveyed certain real estate to the six children who are the residuary legatees in her will; and her estate at her death amounted to $4,000 or $5,000. In March, 1921, a guardian of her property was appointed. In the same month she was taken to a sanitarium in Dubuque, where she remained until in December of that year. From the death of her husband in 1915 until she was taken to Dubuque, she maintained her own home, a companion or nurse living with her practically all of the time. On her return from Dubuque, she lived with her daughter Mrs. Francis, one of the proponents, until her last illness, when she was taken to a hospital about three weeks before her death in January, 1923.

The testimony of four of the contestants and the husbands of two of them was to the effect that at times when they called upon testatrix, she would fail to recognize them until told who they were, and that she cried when talking of deceased members of her family. One of them testified that she talked at random; another that at times she would not answer, and would talk of other things; another that, after she returned from the sanitarium at Dubuque, she said that a daughter, then deceased, had nursed her there; and that she put flowers on the grave of a deceased son after his body had been removed to another place. Two of them testified that in 1916 she mistook the hus-

band of a granddaughter for her deceased son. Some of these witnesses testified that the testatrix was insane. A considerable part of their testimony related to the time after her return from Dubuque.

A nurse who attended testatrix for ten days shortly before she was taken to Dubuque testified, in substance, that during that time testatrix was not suffering from any real sickness or temporary illness; that at times she was quite rational, but most of the time was depressed, and suspected her family of wanting to poison, starve, or injure her; that she wanted the doors and windows closed, so that they could not enter, to put poison into her bed or food; that she always dusted off her plate and cup, to be sure there was no poison, and on retiring shook her clothes out of the window, to remove a powder she imagined was put there to irritate her skin; that she would get up in the night to bar the doors and windows, and would put a table across the door with a crucifix on it, to protect her from evil spirits and the family; that she would suspect the doctors, said they were poisoning her, and would throw away the medicine; that she said her children had always been kind to her until recently. The witness testified that she was insane.

A physician who had attended her three or four times a year after her husband's death, but who did not see her during 1918, testified, in substance, that as early as 1917 she was breaking down rapidly; that she was childish, with a faulty memory; that she would fail to recognize him until some member of the family would tell her who he was; that her mental condition was such that her statements about herself and her condition were unreliable; that she was suffering from senile dementia; that it is a gradually developing process; that, from 1916 on, she seemed to be failing physically and mentally; that she got no better; that she had no ravings or delirium in 1917, and he did not notice any delusions; that her mental condition was not such that she could take care of herself, and in that sense she was insane; that she never discussed her property or relatives with him; that in 1919 or 1920 she spoke to him about the poisoning, and was suffering from fixed delusions. He testified that from 1917 he did not consider her entirely sane; that senile dementia is a form of insanity; that she was insane; that

senile dementia is progressive; that it may be arrested from time to time in its development, but is never cured; that few people lived to her age that had her mental strength; that people with senile dementia continue to transact business for varying lengths of time and with varying degrees of success.

This is substantially all of the testimony on behalf of contestants upon the subject of the mental capacity of the testatrix. None of it relates to her condition at or near the date of the execution of the will. The nurse testified to a time shortly before her removal to Dubuque, which was over two and a half years after the will was made. It is conceded that at that time she had a delusion that people were trying to poison her. The doctor did not see her from some time in 1917 until in 1919,— the exact dates are not shown. Some of the other witnesses testified to her condition in 1918 and to occurrences in that year, but none of them fixed any time closer to the date of the will than that.

The doctor also testified that in ordinary senile dementia there are other indications of disease, such as variations of personal habits and normal habits, slight thickening of speech, a slight drooping of the eyelids, symptoms similar to paralysis in the movement of the hand, a weak hand, variation in the pupil or reflection of the eye. There was no testimony that testatrix manifested any of these symptoms.

On the other hand, it appears without contradiction that, up until the appointment of her guardian, she had attended to the business of her household, either making necessary purchases herself or directing that they be made, examining the bills, and paying them in cash or by check. After the conveyance of her real estate to her children, she had exercised no control over it. There is a contention that that conveyance was merely to enable the children to manage the property, inferentially because of her inability to do so. Upon this we express no opinion. Prior to going to Dubuque, she received visits from neighbors and friends, occasionally visited them, and conversed intelligently with them; she looked after her garden and chickens; her personal habits continued to be cleanly and orderly.

It is shown that she had made a previous will before her husband's death; that she then said she wanted to give some

money to her grandchildren, and the income from her property to her husband for life; and that after the life estate the property should go to her living children. The former will was drawn by M. F. Healy, who also drafted the present one. Mr. Healy testified that he was called by her son to see about her will; that he and his son, T. M. Healy, went to her home; that he talked with her on general subjects, and then about the will; that they discussed the bequest to the church; that she told him the other bequests she wished to make, giving the names of the persons to whom she wished to make bequests and the amounts; that she said to fix it so that the balance would go to the five boys and Mary (Mrs. Francis), if there was any balance; that she said the amount to be disposed of was $4,000 or $5,000; that he had the will prepared from memoranda made by his son, and they returned three days later, with Nicholas Kauffman; that, when he introduced Kauffman to her, she said she knew him; that the will was read to her, clause by clause, by T. M. Healy, and she said it was right, until he came to the clause referring to the widow and children of Joe Koll; that she said she didn't want it that way; that there must have been some mistake; that it was not the way she wanted it; that she wanted to give $200 to Mrs. Anna Koll and $10 to each of the children; that the will was then interlined, and she said that was the way she wanted it; that the will was then translated to her in German, and she said, "Yes, that is what I want," and it was signed. Mr. Healy testified to numerous remarks by the testatrix on both occasions, evincing an unclouded memory and a rational understanding, not only of the provisions of the will, but of other matters of present observation and interest; that she said, in reference to his loss of sight:

"It is a good thing your poor mother did not live to see you blind. I am glad she never saw you that way."

He testified that he did not observe anything in her tone of voice or general attitude "that distinguished her from the person he had known for over thirty years;" that he observed nothing to indicate that she was forgetful, or did not recognize him; and that in his opinion she was of sound mind. T. M. Healy testified, in somewhat less detail, to substantially the same things, and that he observed no lapses of memory, hesi-

tancy of speech, or anything unusual, and that in his opinion she was of sound mind. Kauffman testified to having known her slightly for about twenty years; that, on the occasion when the will was signed, there was no absent-mindedness, no talking at random; that he could not tell any difference ''from the woman he had known during the years preceding.''

Viewing the testimony in the light most favorable to contestants, it may be said to show that the testatrix, at the advanced age of 91, when she executed the will, had for some years been failing mentally and physically; that she was suffering from senile dementia, the apparent manifestations of which, up to that time, being childishness, impairment of memory, and the failure to recognize her grandchildren at first. During this time, however, she managed her home, looked after her bills and the payment of them, attended to her garden and her chickens, conversed rationally with her neighbors, and, at the execution of her will, advised her attorney of the amount of her estate, gave him the names and relationship of twelve legatees and the amount she wished to give to each, told him the disposition she wished to make of the remainder of her estate, discovered an error in the draft of the will prepared for her signature, and signed it only when it was corrected to meet her wishes. In the year following the year in which the will was executed, her mental condition was worse, and then or thereafter she became subject to delusions, and two and a half years after making the will, the delusions were pronounced. These are the salient points in the record, briefly stated.

Advanced age is not, in itself, evidence of unsoundness of mind. *Ross v. Ross,* 140 Iowa 51; *Sutherland State Bank v. Furgason,* 192 Iowa 1295. Nor do old age and failure of memory necessarily deprive one of testamentary capacity. *Gates v. Cole,* 137 Iowa 613; *Perkins v. Perkins,* 116 Iowa 253. To constitute senile dementia, in such legal sense as to deprive one of testamentary capacity, there must be such a failure of the mind as to deprive him of intelligent action. *Gates v. Cole,* supra. We have said:

''His mind may become debilitated by age or disease, the memory enfeebled, the understanding weak, he may even want the capacity to transact many of the ordinary business affairs

of life; but if he has mind enough to understand the nature of the instrument he is executing, to recollect the property he means to dispose of, the objects of his bounty, and the manner in which he wishes to distribute it among them, he has testamentary capacity.'' *Perkins v. Perkins,* supra.

Insane delusions show a diseased condition of mind, and will render invalid a will which is the direct result of such delusions. *Hardenburgh v. Hardenburgh,* 133 Iowa 1.

Testatrix is not shown to have been subject to delusions prior to, or for a considerable time after, the execution of the will.

Does the record, when read in the light of these long settled rules, present sufficient evidence to sustain a verdict that the testatrix lacked testamentary capacity at the time the will was executed? In *Seamans v. Gallup,* 195 Iowa 540, we said it was not, in cases of this character, a question whether there is any evidence of mental incapacity, ''but whether there is enough evidence that ought reasonably to satisfy the jury 'that the facts sought to be proved are established.' *Bales v. Bales,* 164 Iowa 257. Some evidence of mental incapacity is not sufficient to submit the question to the jury.''

It is true, senile dementia was shown to be, and ·is recognized as, a progressive and incurable mental condition. But we think that the evidence of the mental condition of testatrix a considerable time prior to the execution of the will, and testimony of a more serious condition long subsequent to that time, did not present a jury question, in the face of the uncontradicted testimony that, at the very time the will was made, she clearly understood the nature of her act, recollected and knew the extent of her property and the natural objects of her bounty, and understood the manner in which she wished to distribute her property among them.

The court should have directed a verdict for proponents at the close of all the testimony, or, failing that, have sustained the motion for a new trial.

The judgment is—*Reversed.*

FAVILLE, C. J., and EVANS, STEVENS, and DE GRAFF, JJ., concur.