IN RE ESTATE OF OLE JOHNSON.

No. 43416.

NOVEMBER 17, 1936.

REHEARING DENIED MARCH 19, 1937.

Warren H. White, for appellants.

Fisher & Riter and L. R. Boomhower, for appellees.

STIGER, J.—The testator and his wife, Ellen Malena Johnson, lived near the town of Inwood, Iowa, for many years, excepting a brief residence in Canton, South Dakota. By their mutual efforts they accumulated considerable property, consisting of a residence in Canton, an improved 60-acre farm, known as the home place, and a 160-acre farm near Inwood.

The title to the farm property was in the testator and his wife jointly and the title to the residence property rested in Ole Johnson. They had no children, and took into their home two foster children, Esther Lee and Godfred Evold, who is also known as Guffie Johnson.

Esther was only a few months old when she was taken into the home and she was cared for by her foster parents until her marriage. She was known as Esther Johnson until her marriage. Francis Lee, one of the devisees in the will, is a fourteen-year old son of Esther Lee. Guffie Johnson was five years old when taken into this home and remained with Mr. and Mrs. Johnson until his marriage in 1907. He went to California and remained there until his death in February 1934. Guffie Johnson left nine children surviving him and these nine children are the contestants in this will contest.

Ellen Johnson passed away in June 1930. The married life of Ole Johnson and his wife was a happy one. Mr. Johnson would consult with his wife in regard to their business affairs and the record discloses he had a deep affection for her.

In 1921, they each made a will on the same day. Mrs. Johnson gave her husband a life estate in all her property and the remainder to the daughter, Esther Lee. Ole Johnson devised a life estate in all his property to his wife and the remainder, with the exception of the Canton property, to Guffie Johnson, the foster son. He gave the Canton property to Esther Lee.

Ole Johnson had a brother named E. J. Styke, who had changed his name from Johnson to Styke.

On August 12, 1933, the testator filed a voluntary petition under the provisions of Code section 12617 for the appointment of his brother, E. J. Styke, as guardian of his person and property.

After describing his property, the testator stated that he was 73 years old, a widower, and had no children and that he was not in the best of health and found it a great hardship to look after his property and asked for the appointment of Mr. Styke as his guardian.

On October 26, 1933, Ole Johnson executed a will which is the subject of this litigation. This will revoked all prior wills and gave the 60-acre home place to Peter Johannes Styke and 80 acres of the 160 acres to Ingolf Styke. The remaining 80 acres he devised to seven of his nieces, Francis Lee, and to two brothers and to a sister of his wife, in equal shares. He gave one dollar to Esther Lee. No provision was made in the will for Guffie Johnson or his children, the contestants herein. As above stated, in the 1921 will, Guffie Johnson was given the 160-acre farm and Esther was given the Canton residence.

During the time the foster children remained at home, Mr. and Mrs. Johnson treated them as they would naturally treat their own children. After Guffie Johnson married and moved to California it does not appear that he ever saw his foster parents again or communicated with them. After Esther married and moved from Inwood, she returned to the Johnson home for a few days during Mrs. Johnson's last illness. Mrs. Johnson died in June 1930, and so far as disclosed by the record, Esther did not see Ole Johnson again during his lifetime. He did not live with her nor did they visit one another. Ole Johnson died in December 1934.

On January 7, 1935, Esther Lee filed objections to the probate of Ole Johnson's last will and on January 31, 1935, the

nine children of Guffie Johnson filed what is termed amended and substituted objections to the will.

The contestants attacked the will on the grounds that the testator was mentally incompetent to make a will and that the will was the result of undue influence of E. J. Styke, brother of the testator. The jury returned a verdict for the contestants.

Proponents' motion for a new trial was overruled. Proponents appeal.

The testator was 73 years old at the time he made, his will and had been a strong, vigorous man being about five feet seven inches tall and weighing two hundred pounds. After the death of his wife, he commenced to fail and at the time he made his will in October 1933, he weighed about one hundred seventy-five pounds.

After his wife's death in 1930, Ole Johnson lived a part of the time on the home place with his tenants and part of the time with his brother, E. J. Styke. He spent the last year of his life with his brother. The testator visited frequently at the home of his niece, Carrie Eliason, and at the homes of his neighbors and friends.

On May 29, 1933, Mr. Johnson requested his niece, Mrs. Eliason, to go to Canton with him to help him buy flowers for his wife's grave for Decoration Day. While at Canton he fell over in a store and was taken to the hotel and placed in bed. Dr. Delaney was called. Dr. Delaney testified that he found evidence of uremic poisoning and that there was no evidence of paralysis. The patient was in a coma and remained unconscious for about two hours. Mr. Johnson recovered and went home with Mrs. Eliason and her husband the same day and the next day, which was Decoration Day, was able to go to the cemetery with his niece. Dr. Delaney referred to this illness as a convulsion. Mr. Johnson had no further illness until November 4, 1933, when Dr. Delaney was again called. At this time he had a partial stroke and was in a coma. This coma lasted one day. Dr. Delaney testified, after three or four days the patient cleared up mentally and was capable of transacting business. At this time the patient's blood pressure was high, due to uremic poisoning, and Dr. Delaney testified that the progress of uremic poisoning could be stopped. Dr. Delaney last saw Mr. Johnson in the spring of 1934, when he was suffering from uremia. He again treated Mr. Johnson for uremia in the summer of 1934, and tes-

tified that uremic poisoning was ultimately the cause of Mr. Johnson's death in December 1934. He testified that the loading up of the blood stream with uremic poisoning is a gradual process. Dr. Delaney testified with regard to his condition in the summer of 1934, that it would be difficult to say he was afflicted with senile dementia; that he was suffering from uremia and it would be hard to say where the uremia quit and the senility began.

Dr. Stewart testified that he examined Ole Johnson in November 1934; that he was then in an advanced stage of senile dementia. His genito-urinary organs were most affected. He had heart and kidney inflammation and edema. He testified that senile dementia is degeneration of the cells of the brain and means a weakening of the mind rather than an impairment of the mind; that some days the patient would seem brighter than other days. Dr. Stewart further testified that Mr. Johnson would know his friends and relatives up to within four or five months before he died and that Mr. Johnson recognized him when he called on him in November, 1934. Dr. Stewart saw Mr. Johnson on the street several times in 1933 and spoke to him and Mr. Johnson knew who he was.

The will was executed on October 26, 1933. Mr. Johnson did not go into a complete coma in his last illness until December 5, 1934.

Mrs. Ode, a registered nurse, who took care of Mr. Johnson when he was taken ill on November 4, 1933, stated that he was in bed two or three weeks in the home of E. J. Styke. She testified that he suffered from a slight stroke and that he was conscious all the time she was there. He would gradually get up and walk around with help. He talked to her about his home and property and told her he missed his wife and was lonesome and he knew what he was talking about.

Fifty-seven witnesses testified in this case. We will summarize the testimony of the contestants.

The testator was normal at the time of his wife's death in 1930. He brooded over her death, stating that there was nothing much left to live for. He talked of her virtues repeatedly and would cry when speaking of her. He was emotional. His conversation and appearance changed after her death. In the midst of one topic he would change to another topic of conversation. He would repeat his conversations. He became stooped

and had a shuffling walk. His eyes had a "starey" expression and were bulgy. He had little control of his urine and bowels. While staying at the home place with his tenant, Harold Eliason, son of Carrie Eliason, he would occasionally visit with his tenant and his wife, clad only in his shirt. One night in the year of 1932, he walked to his home place from a neighbors, a distance of nearly one-half mile. When he reached the home place he lay down by a fence for a half hour. The witness stated that she thought there was snow on the ground. His tenant, Harold Eliason, testified that on two or three occasions he found Mr. Johnson lying on the cement floor in the hog house with hogs around him. Mr. Johnson would often talk to himself and sometimes laugh or cry when doing so. He drove his own car until sometime in August 1933, after which time Francis Lee drove for him. Mr. Johnson was not a good driver. One time he drove his car over the flower bed of an oil station and asked, "Where am I?" He talked to several persons about marriage, referring to two or three women. He wanted to marry one woman because she looked so much like his wife. There was nothing disrespectful or questionable about his remarks. Several witnesses regarded his talks about marriage as a joke. He often spoke of his own honesty and the dishonesty of other people. He had trouble with his tenants over rent. After the death of his wife he spoke of the cost of her funeral and her last illness. He was forgetful. His table manners were bad. His hands were shaky. He was uninterested in life.

One witness testified that he was of unsound mind because he did not know how many eggs he received nor the amount of his cream checks.

The testator rented his farm on shares, and attended to the business until August 1933, when he asked for the appointment of his brother as guardian. One witness said he was of unsound mind because he sat and cried and would not say anything. If asked a question, he would not listen but would start a conversation of his own and often repeat it. He had disputes with his neighbors about which end of a partition fence he was to keep up and one neighbor testified that he was of unsound mind because he did not remember which part of the fence he was to keep up. Ole insisted it was the east end and the neighbor insisted it was the west end. One witness testified that he did not make correct change for a small purchase of gasoline for his car.

His conversation was coherent but not connected. He was not clean about his person and looked unkempt. One witness testified that he was of unsound mind because he cried at her house, another because he was childish.

Reverend Thorson, a minister of Inwood, testified that he talked with decedent in 1933; that his general topics of the day were economic questions; that he talked with him about Christianity and Ole stated that he had done the fair thing with his fellow men all his days; that many people were dishonest. He repeated these statements frequently. The witness stated that Mr. Johnson's speech was not on the same order that it was when he first learned to know him. His steps were short and he dragged his heels. The witness bases his conclusion of unsound mind on the repeated statements that he had always been absolutely honest and a good man and mistrusted his fellow men.

In his 1921 and October 26, 1933 wills, the testator undertook to devise the 160 acres, when in fact, he owned a half interest with his wife. The wife, in her 1921 will attempted to devise the entire 60 acres, though she owned only a half interest therein with her husband.

From the above testimony, it is evident that the testator failed mentally and physically and developed certain eccentricities after the death of his wife. However, it is not every unsoundness of mind that makes a testator incapable of making a valid will. Mere deterioration in physical or mental powers, eccentricities, childishness, forgetfulness, unclean personal habits, a changed personality and inability to transact business generally are not sufficient to carry to the jury the question of a testator's unsoundness of mind. In re Shields, 198 Iowa 686, 200 N. W. 219; Bishop v. Scharf, 214 Iowa 644, 241 N. W. 3; In re Will of Johnson, 201 Iowa 687, 207 N. W. 748; In re Will of Kenney, 213 Iowa 360, 239 N. W. 44, 78 A. L. R. 1189; Cookman v. Bateman, 210 Iowa 503, 231 N. W. 301; Flynn v. Moore, 181 Iowa 1163, 165 N. W. 351.

The question presented here is, whether or not there is sufficient evidence offered on behalf of contestants to take to the jury the question of whether or not testator was so lacking in mental capacity at the time of the execution of the will as to be unable to intelligently know the property which he possessed, the natural objects of his bounty and to intelligently exercise judgment and discretion in the disposition of his property.

The following testimony of contestants shows that Ole Johnson knew the objects of his bounty and the extent of his property in the year of 1933.

Carrie Eliason, one of the main witnesses for the contestants and a niece of the testator, stated that he frequently told her about the wills of himself and his wife made in 1921 and stated in the year 1933 that Guffie was to have the 160 acres and Esther was to have the 60 acres and the home place.

It will be observed that this is a correct statement by the testator of the disposition of the property of himself and wife made in their wills executed in 1921.

Herman Hanzen testified that Ole Johnson told him the number of cattle, hogs and chickens that he owned jointly with his tenant, Otto Helgerson.

Mr. Renshaw testified that he talked with Mr. Johnson in the late summer or early fall of 1933. The witness testified that, ''in talking of his property he would enumerate the different pieces and apparently knew what property he owned; he told me he didn't have any debts on it.''

Mr. Foote testified that during the year of 1933, he would come to town and go home alone and knew where he lived.

Mr. Moen testified that, ''in May 1933, Mr. Johnson talked about his business affairs and what property he owned. He said his property was clear. He did not tell me what property he had, because I was familiar with that, as I knew just what he had. He talked to me about some of his relatives, about Esther in particular, and his brother Mell; he seemed to know who Esther was. He talked about Esther's association with him and about his brother, Mell, that is E. J. Styke. He told me that he had planned on getting Mell to look after his property because it was causing him too much worry and asked me what I thought of that. I told him I thought it was a fine thing to do.''

Harold Eliason, who farmed the home place in 1933 and 1934, testified that, ''when the lease was made in February 1933, I did not think that Ole was of unsound mind. I hadn't thought of any such thing. We made the lease in the bank at Inwood. John Snid, my dad, Ole and I were there. After Snid read the lease, Ole said it was just the way he wanted it. Once in awhile he talked about his relatives. He seemed to think they were all right. He knew who they were and mentioned their names. This was in 1933. He told me about his property. He spoke

about the one-quarter and the house in town. He always called the place where he lived, the 60 acres and referred to it as the home place. He called the house and lot in Canton the house. He mentioned the different prices he paid for personal property.'' The witness thought Ole was failing ''more so after the summer months of 1933''.

Glen D. Foldts testified, ''he always was kind of a pop-eyed man; his eyes were bloodshot most always. At different times he would talk about all of his relatives; he seemed to know who we all were. My wife is a niece of Ole Johnson. He failed more rapidly than most men do after his wife died. I would say this was due to age and some grief.''

Mrs. Ode, the nurse who cared for Mr. Johnson when he was taken ill November 4, 1933, testified that he talked to her about his home and property and told her he missed his wife and was lonesome and knew what he was talking about.

The burden of proof to establish the invalidity of the will was on the contestants. Testimony of the contestants establishes that the testator looked after the renting of his property until August 12, 1933, on which day he petitioned the court for the appointment of his brother as his guardian, because he found it a hardship to look after the property. He knew the extent of his property and the natural objects of his bounty and had the power of intelligent action at the time he executed the will.

During the year 1933 and the large part of the year 1934, the testator was capable of making a will except the times he was in a coma induced by uremia. This condition responded to treatment and would last only a day or two and in the interim between these attacks the testator would, as stated by Dr. Delaney, ''clear up mentally''. There is no evidence that he was ill from this trouble during the month of October 1933.

It is true that senile dementia is a progressive disease. Dr. Stewart testified that the decedent was in the advanced stages of senile dementia in November 1934. There is no evidence that he had this disease on October 26, 1933, other than the inference that might be drawn from the fact that the disease is progressive. If the testator was afflicted with this disease on the date of the will, there is no evidence of the stage of the disease on that date.

Where senile dementia is relied on to invalidate a will, there must be such failure of the mind as to deprive the testator of intelligent action. Gates v. Cole, 137 Iowa 613, 115 N. W. 236;

In re Estate of Koll, 200 Iowa 1122, 206 N. W. 40. There is an entire lack of evidence that the testator had reached this stage on October 26, 1933.

The testimony of proponents shows that the testator visited with his friends and relatives in 1933 and a part of the year of 1934, conducted business transactions, conversed normally and was competent to make a will.

In re Estate of Paczoch, 202 Iowa 849, 853, 211 N. W. 500, 501, this court said: ''The right of a citizen to dispose of his property which he has accumulated during his lifetime in such manner as he sees fit, under certain statutory limitations, is one of the greatest inducements to thrift and to the accumulation of property, and one that the courts should be slow to deprive a testator of exercising because of a claim that he is mentally incompetent to do so. It is a matter of common knowledge that with advancing years the faculties grow dim, and the mental processes are slower; but such condition, without more, does not necessarily deprive a testator of the mental capacity to execute a valid will.''

After careful consideration of the entire record we reach the conclusion that the evidence offered by the contestants to prove testamentary incapacity was not sufficient to justify the submission of this issue to the jury.

Contestants claim the will is invalid because of undue influence exercised on the testator by his brother, E. J. Styke. Carrie Eliason, niece of the testator, but not a beneficiary under the will, testified that, ''I heard Styke talk to Ole Johnson about his property. I heard him say that he mustn't think of letting his sixty go to any one but one of of his boys. We just drove out of the gate and turned into the road when I heard this conversation. That was the evening Mrs. Johnson died. I was in the car. E. J. Styke, Ole Johnson and Mrs. E. J. Styke were in the car.''

Mrs. Johnson died in June 1930, three years before the will was executed. The testator, after the death of his wife, lived much of the time with his brother and died in his home.

Mr. Reimers, the attorney who prepared the application for appointment of E. J. Styke as guardian, testified that the testator stated to him when he came to his office to have the petition prepared that, ''I am older than E. J. Styke and we have al-

ways been together and when he was a little fellow I had to take care of him. Now we have grown old and he has to take care of me. I can't take care of my property."

The first paragraph of the will reads as follows:

"I, Ole Johnson, of Richland township, Inwood, Lyon county, Iowa, being of sound mind and disposing memory and due to my defective hearing, with the assistance of my brother, E. J. Styke, whom I have requested to assist me in making this, my last will and testament, do hereby publish and declare," etc.

This paragraph was dictated by Mr. Reimers, the attorney who drew the will. With regard to this provision, Mr. Reimers testified, "I got the material that was put in the will, the provisions of it, from Ole Johnson. Ole came into the office with E. J. Styke and said he wanted to make a will. I then told Mr. Styke to go into the other room, that I wanted to talk to Ole. He couldn't correctly give me the description of the property. When we came down to paragraph four, I saw that he got into a whole lot of names, and I called in E. J. Styke to verify the names and descriptions. Styke said nothing other than the names of parties included in paragraph four. He and Ole discussed the names. All I remember is, that he helped me get the names, the spelling of them and who they were. Styke helped me with the description of the property in paragraph four. Ole was slow and it was late in the afternoon and I guess in order to hurry it up, I wanted Styke to check on the names and descriptions. I knew Styke could help me some. The only reason I can give for being in the will the words, 'and due to my defective hearing, with the assistance of my brother, E. J. Styke, whom I have requested to assist me in making this, my last will and testament,' is that I dictated the preamble, the first paragraph, and I put it in the will. I know I did not get along very well in understanding him. Now perhaps I got the impression that Ole couldn't hear very well."

Mr. T. E. Moen testified for contestants, "that in 1932 when he told the testator he was failing, the testator replied, 'no, outside of my hearing, I am as strong as a horse.'"

There was some evidence on the part of the contestants that the testator's hearing was not affected. There is no evidence that Styke dominated or controlled his brother in any manner.

The day the will was executed, the testator was at his home

place on the 60 acres. Styke called for Ole and Peter Styke, son of E. J. Styke, drove the car. They stopped at the home of Lars Attletweedt, a neighbor and friend of Ole Johnson for 22 years, and took him along to act as a witness to the will. · Mr. Attletweedt testified that, ''Ole came over to his place and asked him to go with him to Rock Rapids and be a witness on a will he was going to make. I told him that I would do that, and came to Rock Rapids with him.''

E. J. Styke was not a beneficiary under the will. Influence, to be undue, must be such as to substitute the will of the person exercising the influence for that of the testator thereby making the writing express, not the purpose and intent of the testator, but that of the person exercising the undue influence. It must operate at the very time the will is made and must dominate and control the making of it. Worth v. Pierson, 208 Iowa 353, 223 N. W. 752.

Undue influence is not established by proof of opportunity to exercise it and disposition to do so. In re Will of Richardson, 199 Iowa 1320, 202 N. W. 114.

Importunity, requests, and persuasion that do not go to the point of controlling the will of the testator are not sufficient to constitute undue influence. Perkins v. Perkins, 116 Iowa 253, 90 N. W. 55; Worth v. Pierson, supra; Cookman v. Bateman, 210 Iowa 503, 231 N. W. 301.

The contestants introduced evidence of statements of the testator of his intention to leave his property to persons other than the beneficiaries named in the will.

 Such declarations of the testator cannot be considered in determining whether the undue influence has, in fact, been exerted. If the fact of undue influence has been independently established, such declarations are admissible to show the testator's state of mind, his susceptibility to undue influence and his capacity to resist it. The foundation for such testimony must first be laid. Muir, Administrator, v. Miller, 72 Iowa 585, 34 N. W. 429; In re Will of Diver, 214 Iowa 497, 240 N. W. 622; Johnson v. Johnson, 134 Iowa 33, 111 N. W. 430; In re Will of Crissick, 174 Iowa 397, 156 N. W. 415.

There is no proof of facts in the record to sustain the conclusion that the will of the testator was the result of undue influence on the part of his brother, E. J. Styke.

The contestants failed to establish the invalidity of the will, and the motion for new trial should have been granted. For the reasons given the case must be, and is, reversed.—Reversed.

PARSONS, C. J., and KINTZINGER, DONEGAN, and ALBERT, JJ., concur.