*In re* JACKSON'S ESTATE.

JACKSON *v.* WHITE.

WILLS—MENTAL INCOMPETENCY — UNDUE INFLUENCE—EVIDENCE — DIRECTED VERDICT—HABITUAL DRUNKENNESS.

In the contest of a will by testator's daughter and grandson on the ground of mental incompetency of testator and undue influence over him by proponent, his second wife, to whom he willed the bulk of his property, the judgment in favor of contestants is reversed, on error, per WIEST, BIRD, SHARPE, and STEERE, JJ., on the ground that the evidence warranted a directed verdict for pro-

On effect of unnatural testamentary disposition on the question of undue influence, see notes in 6 L. R. A. (N. S.) 202; 22 L. R. A. (N. S.) 1024.

ponent; and per FELLOWS, C. J., and McDONALD. MOORE, and CLARK, JJ., on the ground that, although the case should go to the jury, the trial court erred in instructing them that the habitual drunkenness of proponent might be considered as substantive evidence of undue influence.

Error to St. Clair; Tappan (Harvey), J. Submitted January 31, 1922. (Docket No. 81.) Decided December 5, 1922.

Nellie Jackson presented for probate the last will and testament of Abner Jackson, deceased. The will was allowed in the probate court, and Sarah Josephine White and another appealed to the circuit court. Judgment for contestants. Proponent brings error. Reversed.

*Lincoln Avery* and *George C. Watson*, for appellant.

*Walsh & Walsh*, for appellees.

SHARPE, J. Abner Jackson died on July 31, 1919, leaving a last will and testament, executed on December 12, 1918, by the terms of which he bequeathed to his grandson, Franklin Jackson, $50, to his daughter, Sarah Josephine White, $5,000, and the residue of his estate to his wife, Nellie Jackson. Mrs. White and Franklin's father were children of a former wife, a sister of proponent, then living but divorced from testator. Notice of contest was filed by Mrs. White and the guardian of Franklin, who was a minor. The will was admitted to probate and an appeal taken to the circuit court. The reasons for the contest were the alleged mental incompetency of the testator and the claim that the will was executed owing to the undue influence exercised over the testator by his wife. At the conclusion of the proofs, proponent's counsel moved for a directed verdict. The trial court withdrew the question of mental incompetency from the consideration of the jury and submitted to them the

question of undue influence. They found against the will. Proponent reviews the judgment entered by writ of error.

At the outset it may be stated that the deceased went alone to his lawyer's office, instructed him as to the disposition he desired to make of his property, and returned later in the day and executed the will in the presence of the lawyer and the cashier of the bank at which he did business, who was called in at his request to act as a witness. The circumstances surrounding the making of the will are not such as to lead to any inference that undue influence had been exercised in procuring its execution. He took the will with him and it was found by his attorney among his papers after his burial. The proofs submitted by contestants were offered to support the claim of mental incompetency as well as undue influence.

There was considerable testimony tending to show that proponent was in the habit of drinking intoxicating liquor to excess, to the mortification of the deceased. During the greater part of their married life of more than 20 years, the deceased was the proprietor of a hotel at Capac, in which a bar was maintained. He drank himself, though it is claimed not to excess. Witnesses for contestants testified that he served liquor to proponent and guests in the living rooms of the hotel. This testimony is said to show the improbability that deceased would confer upon his wife "full possession and control" over the residue of his estate "when he knew that she was a person who constantly indulged in intoxicating liquors, became intoxicated and irresponsible." There is no testimony tending to show that proponent was wasteful of money when drinking, went on sprees or trips, or otherwise squandered or was likely to squander testator's money or her own in the use of intoxicating liquor.

A former will was executed by the deceased in 1917. It appears that it was kept by him until 1919. It was not found among his papers after his death. Attorney Watson, who prepared it, as well as the second will, testified to its contents from his notes used in its preparation. At that time, a daughter, Vonda, a child of the second marriage, about three years of age, was living. It appears that both the testator and the proponent were deeply attached to her. In this will, he gave to the proponent his residence in Yale and his hotel in Capac, with reversion to Vonda in the event of her death or marriage. Five thousand dollars was bequeathed in trust to his son Frank, the father of Franklin, to be so held until he reached the age of 37 years. In case of Frank's death, $1,000 was to go to his children and the balance to proponent and the children of testator. Mrs. White was to get $1,000. Vonda was to have $1,000 stock in the Yale Woolen Mills and she and proponent the use of his 120-acre farm. In the event of their death or the marriage of his wife, the farm was to go to his children. Frank was to get outright two city lots in Detroit of no great value. All moneys after payment of his debts were to be divided between proponent and Vonda. It is insisted by contestants that the change made in the disposition of his property to proponent's benefit in the second will is a strong indication of undue influence exercised by her over him in its making. If we apply the rules of law applicable to testamentary disposition, we do not think any such inference can be fairly drawn therefrom.

Counsel lose sight of another fact strongly indicative of the reason why the second will was made and why the provision for proponent was so much increased therein. Both the deceased and proponent were greatly affected by the death of Vonda, which occurred in 1918. They made several efforts to adopt a child

to take her place.    In March, 1919, they entered into
a written agreement with Mrs. Milburne, of London,
Ontario, by the terms of which she turned over to them
her female child about two months old.    They agreed
to adopt this child and to "maintain, board, lodge,
clothe and educate" her "in a manner suitable to the
station of the parties of the second part to the same
extent and in the same manner as if the said child
was their own lawful child."    The deceased grew
very fond of the little babe and it is apparent that he
was impressed by the obligation as to its care, etc.,
which he and proponent had assumed.    No legal adop-
tion papers were executed.

The obligation primarily resting on him at the time
the will in question was made was to provide for the
proponent, with whom he had lived for about 20 years,
who, aside from the claims made as to her drinking
habits and to alleged trouble with his daughter, Mrs.
White, had been a prudent, faithful, hardworking wife
and mother.    This obligation, at least to the extent
for which the law makes provision for her, could not
be avoided.    The legal obligation which both deceased
and proponent had assumed in the agreement with
Mrs. Milburne must also be provided for.    As this
obligation was joint, we think no inference of undue
influence can be drawn from the provision made for
its fulfillment.    There is testimony that after this
will was made he talked with Mr. Watson about re-
viving his first will and making the provision made
therein for Vonda applicable to this child.    He was
advised as to how this could be done.    The fact that
he did not do so is strongly suggestive that upon
further reflection he was satisfied with the will as
made.

There is testimony tending to show that soon after
the marriage of proponent and deceased she had
trouble with his daughter, Mrs. White, and that the

latter was compelled to leave the home. This disagreement is, we think, magnified. It occurred a long time before either will was made. For several years before testator's death, Mrs. White was frequently at his home and, as she says, "my relations with her were outwardly friendly." The claim is made that the testator was in error as to the financial condition of Mr. and Mrs. White at the time he made the will in question. Counsel say that "the influence of Mrs. Jackson over him was so strong that she impressed him with the idea that the Whites were financially well fixed." Counsel fail to point out anything in the record even tending to show that the matter was ever discussed between them, and we have found none. If we concede that he was mistaken in the respect claimed, it has no bearing whatever on the claim of undue influence.

The fact that but a small bequest was made to his grandson is commented on. No legal obligation rested on him to make any provision for this child. It appears that his mother had procured a divorce from Frank before his death and was awarded the custody of the child. While it appears that deceased was fond of the boy, it also appears that he discussed the bequest to him with his attorney at the time the will was prepared. We think no inference of undue influence can be drawn from the provision made.

It seems apparent to us that the facts stated did not justify the submission of this question to the jury. It is, however, claimed that there was direct evidence of undue influence which, when considered in connection with such facts, justified the action taken. This claim is based on the testimony of Ethel Jackson, the widow of testator's son Frank. We quote it, so far as applicable, in full:

"It was between 2 and 3 years (weeks) after Frank's death. My father, William Harrison, Mrs.

Abner Jackson and myself were present.    This talk took place in the sitting room occupied by the Jacksons as their own living quarters, in the hotel at Capac. My father, Mrs. Jackson and myself had been over to Yale visiting my husband's grave.    My father was speaking about how that they had settled up things when my husband died, and I didn't have very much trouble, that everything was fixed jointly that we had.

"Q. What did he say about it?

"*Mr. Avery:* Objected to as immaterial and irrelevant.

"*The Court:* I assume it is leading up to other matters that may be more material.

"*A.* He said if he had died before my mother died that things would have been fixed the same way for her and she wouldn't have had no trouble and Mrs. Jackson spoke up and said she was trying to get Abner to fix things up and she was going to raise hell until he did so."

This incident occurred about a month before the will in question was made.    If the language of proponent be construed into an intention on her part to secure the execution of a joint deed of their property, as was intimated, she did not succeed.    If from it we infer that she importuned her husband to make such a deed or to provide for her in a will in the manner in which provision was made, such action on her part would not in itself be evidence of undue influence.    A wife has a right, she owes the duty to herself, to advise, to persuade, to entreat and to importune her husband to make proper provision for her support and maintenance after his death either by deed or by will. There is no proof even remotely tending to show that she carried out her intention as expressed, but had she done so, under the rules of law applicable to conveyances or wills from husband to wife, her act would not, in itself, be sufficient to sustain the claim of contestants.    It must further appear by proof or by fair inference to be drawn from facts established that

the influence exercised by her destroyed the free agency of the testator at the time the will was executed; that it expresses her mind and intent and not his.  Mere suspicion is not sufficient.  *Beyer* v. *LeFevre*, 186 U. S. 114 (22 Sup. Ct. 765).

It is apparent from a careful reading of this record that a great change occurred in the testator's manner of life after the death of Vonda.  This is given expression to by many of his neighbors and friends of long standing.  More than a dozen were called as witnesses.  All testified to facts from which it unquestionably appears that though weakened in body, due to a fall and an attack of influenza, his mind continued normal until shortly before his death.  He was interested in the sale of Liberty bonds, the work of the Red Cross and other war time activities, and subscribed liberally therefor.  Men with whom he did business testified to his keen perception and shrewdness in such matters and his careful management of his affairs.  Rev. John McCue, the Methodist clergyman at Capac, visited him frequently after his attack of influenza.  He was out riding with him on several occasions.  Testator and proponent talked with him about securing a child "to take the place of Vonda in the home."  After the child came, it was baptized by witness and deceased said to him "that it seemed to fill the aching void that was in the heart, it seemed to pacify his feelings."  That on one occasion the deceased said to him, "Elder, I have been thinking some of my spiritual welfare, or my soul's welfare," and that they conversed about such things.

The claim of counsel for contestants is thus summarized in the concluding paragraph of their brief:

"We have the direct evidence that she was doing everything in her power to coerce him.  She 'was raising hell' with him until he did it.  He was a broken man.  He made a will that he had refused for many years to make.  He made an unreasonable

and unnatural will.    He did so under the impression that his only daughter was well off.    He showed that his mind was poisoned against his only grandson. Even up to the last, he wanted to restore the first will.    The facts show that this was not his will."

In our opinion, there is no competent evidence to support the facts claimed.    The will, instead of being "unreasonable and unnatural," is just such a one as a normal man, having in mind his moral obligation to his wife and the legal obligation assumed by him and her to care for, etc., the child they had taken into their home, might well make.

The law in this State applicable when undue influence is claimed is well settled.    We must, however, in reading the decisions, bear in mind the distinction between cases where the claim is made that such influence is exercised by a wife, the natural object of a testator's bounty, and by those not bearing such relation.    The following quotations are illustrative:

"It would be monstrous to deny to a woman who is generally an important agent in building up domestic prosperity, the right to express her wishes concerning its disposal.    And there is no legal presumption against the validity of any provision which a husband may make in his wife's favor.    *  *  *    There can be no fatally undue influence without a person incapable of protecting himself, as well as a wrongdoer to be resisted."    *Latham* v. *Udell*, 38 Mich. 238, 241, 242.

"Unless she either defrauds him or has secured a mastery over his will, which puts him under her control, he cannot be said to have been deprived of his disposing capacity."    *Pierce* v. *Pierce*, 38 Mich. 412, 420.

"Undue influence will not be inferred from opportunity."    *Leffingwell* v. *Bettinghouse*, 151 Mich. 513, 517.

In *Re Williams' Estate*, 185 Mich. 97, the opinion of

this court, written by Chief Justice Brooke, is illuminating of the question here presented. He discusses at length the character of evidence which must be produced to sustain such a claim. Many Michigan cases are cited. He quotes freely from *Ginter* v. *Ginter*, 79 Kan. 721 (101 Pac. 634, 22 L. R. A. [N. S.] 1024). This last citation is accessible to most practicing attorneys. The holdings of many courts are therein quoted from, and it appears that there is practically unanimity in adhering to the rule therein stated:

"To vitiate a will there must be more than influence. It must be undue influence. To be classed as 'undue,' influence must place the testator in the attitude of saying: 'It is not my will, but I must do it.'"

Without further discussion, we content ourselves with a few quotations from some of the cases there cited and quoted from:

"It must not be the mere desire of gratifying the wishes of another, for that would be a very strong ground in support of a testamentary act."

"The influence must overpower the volition without convincing the judgment."

It "must be used directly to procure the will."

"A testator may be led but not driven."

"Persuasion and advice * * * are perfectly legal."

"Suspicion, conjecture, possibility or guess * * * not sufficient."

See, also, the language of Mr. Justice Brewer in *Beyer* v. *LeFevre, supra; Meyer* v. *Jacobs,* 123 Fed. 900, 908.

In *Potter's Appeal,* 53 Mich. 106, 113, it was said:

"Manifestly, to establish undue influence in persons occupying the relation of husband and wife, the facts

and circumstances shown must not only be consistent with the hypothesis of the will having been obtained by undue influence, but it must be shown that they are inconsistent with a contrary hypothesis."

Applying these rules to the proof here submitted, we are of the opinion that the motion of the proponent for a directed verdict should have been granted. The verdict and judgment are set aside and a new trial granted, with costs to appellant.

WIEST, BIRD, and STEERE, JJ., concurred with SHARPE, J.

CLARK, J. (*concurring in part*). The judgment should be reversed but not for the reason stated. Testator at the time of his marriage to the proponent had two children by a former marriage, Franklin and Josephine.

The history of the conduct, purpose, and intent of the proponent, which, contestants claim, continued and culminated in the will in question, begins soon after the marriage. The daughter, then about 15 years, was requested to leave home—of this she testified:

"My father found a letter that Mrs. Jackson had written to some other man, and she blamed me for telling him that she had written the letter, and she quarreled with him over it and left, and my father came to me. * * * He first said to me that we would get along as best we could and was sorry that she blamed me but that he could not change her opinion that I had told him, and while she knew it was wrong she seemed to persist in feeling that I had and he would let it go at that and for me not to feel badly that he thought he could see through her motives when she quarreled with him was trying to get him to transfer his property to her but as long as he knew himself he had no intention of doing it and—* * * He said he would have to tell me that Mrs. Jackson said on leaving that she would not come back while I remained in the house with him and that I would

have to leave; he was sorry to tell me this but felt it would be better for me to go; but life was hell to him on earth and if I was away from there they might get along better, he would try anyhow. He suggested I go as he was going to go after her and so I left the hotel. * * * I was feeling badly because she blamed me for their trouble and he said not to mind that he knew such was not the case and that he thought he saw through her raising these disturbances, that each time that she did before they could fix it up she would try to prevail upon him to change things over to her; but that he believed that as long as he was himself he would not do such a thing, that in the event of his death he had enough that she would be taken care of and there was but the three of us, my brother, myself and her, and that there was enough for all of us."

Later the daughter married and when her baby was born the father came to see her, of which she testified:

"My father came to see me when my baby was born and a few times in between that or before that; he asked me not to speak of it and told me that he had come; he walked to the north end and come down the railroad and came in the back door because we lived 2 blocks straight east from the hotel and she could see him coming if he came that way; every time he come he would ask me not to mention it to any one, saying if it would reach Nell (proponent), that she would raise the dickens with him."

The father visited the daughter occasionally at her home. Of these visits the husband testified:

"After our marriage Josephine did not go to the hotel at all at the first; her father went to see her at her home; he could not come up the main street and come right up to the house, he had to go up a ways and come around and come in the back door and when he got ready to leave he would say, 'Don't say anything about me being here. * * * Because if it got back to Mrs. Jackson she would raise hell with me.' "

When the baby died the testator secretly visited the daughter's home, secretly attended the burial and left the carriage some distance from his home to return unobserved by proponent. On the occasions of his visits to the daughter's home, his usual request was "do not mention that I was here." He gave the daughter Christmas presents, saying "do not mention it; if it reached Nellie she would raise a fuss." On such occasions the father was demonstrative, affectionate, kind in his attitude toward the daughter, but if he met her in company with proponent he appeared cool and indifferent toward her. The daughter and her husband leased a hotel from the father for five years and were at considerable expense in providing equipment. Soon thereafter proponent provoked a quarrel and said to the daughter "you damn little —— I will show you who you are renting from. You will never stay your lease out." The father said to the daughter and her husband that night, "he regretted to ask us to leave but that he would have to do it in order to satisfy her;" "he would have hell on earth until it was done;" "that he had tried to reason with her" but she said "you will have to make them give it up." They surrendered the lease.

The son, Franklin, died leaving a son, also named Franklin, by a divorced wife with whom the father was friendly. He was fond of the boy, wanted to take and keep him and stated that he would always take care of the boy and see that he never wanted for anything and that "he felt he had some moral obligation himself." At one time the boy's mother wrote declining an offer by testator. Of such letter proponent said she wished it had been kept and "that it might come in useful to her some day maybe; that his mother might try to start something to get something for Franklin." When the testator went to the

scrivener to have the will in question prepared he inquired if it was necessary to give the boy anything. He left him $50 so that "there would not be any trouble over the will, as he put it, for the boy or his mother making any trouble."

After the making of the first will, the provisions of which are set forth by Justice SHARPE, and about a month before the making of the will in question, proponent said that she was "trying to get Ab to fix things up and that she was going to raise hell until he did so." A brother of testator testified of conversations with testator:

"*A.* I have heard him mention about her feelings towards him.
"*Q.* State what that was?
"*A.* He said all she was waiting for was his property; all she wanted was his property."

Soon after the making of the will in question testator returned to the scrivener, of which:

"he wanted to know whether the old will of 1917 could be taken and the child they had in the house be inserted in that will in place of Vonda. I asked for the 1917 will, and he brought it out, and he wanted to know if that will could be taken and used simply by putting this new child in Vonda's place."

When the will was being prepared testator said that his daughter was "well fixed or comfortably fixed, or some such expression." There was testimony that this was not true in fact. The proponent did not take the stand at the trial but she gave testimony in probate court, portions of which, claimed by contestants to be admissions, were read into the record, by which it appears that proponent had talked with the testator about the daughter's being well off. The will gives to the daughter $5,000, to the son of Franklin $50, and the residue, about $26,000, to proponent. In the first will the provision for proponent was in the main

a life estate. There was testimony, over objection, that proponent was, during the time in question, an habitual drunkard and that the testator gave expression of his state of mind upon this matter. During the last months of the testator's life, within which time the will in question was made, as stated by a number of witnesses, he was ill, broken and declining in health, in pain, sorrowing, despondent. There was testimony that the physical changes were accompanied by evidence of failing mentality. His baby, Vonda, and his son, Franklin, were then dead. This in outline is the evidence adduced by contestants.

1. Undue influence. Motion to direct a verdict. The evidence on this question must be viewed in the light of testator's mental and physical condition at the time. It is said in *Re Hoffmann's Estate*, 151 Mich. 595:

"To some extent, also, the undue influence sufficient to set aside a will must depend upon the physical and mental condition of the testator.

" 'The two are usually intimately connected. What would be undue influence in a case of physical and mental weakness would not be undue influence where he was in the full possession of his mental faculties.' *In re Seymour's Estate*, 111 Mich. 203."

And there mental incompetency of the testator was not in the case as considered. See *In re Hillman's Estate*, 217 Mich. 142; *In re Seymour's Estate, supra*.

It is not important that the evidence of undue influence is largely circumstantial, nor that the threat of proponent that "she was going to raise hell" until testator "fixed things up" was not followed by positive testimony of overt acts. It was said in *Rivard v. Rivard*, 109 Mich. 98 (63 Am. St. Rep. 566), quoting from syllabus:

"Undue influence is not exercised openly, but, like crime, seeks secrecy in which to accomplish its poison-

ous work.   It is largely a matter of inference from facts and circumstances surrounding the testator, his character and mental condition as shown by the evidence, and the opportunity possessed by the beneficiary for the exercise of such control."

Whether the changes respecting proponent in the second will as compared with the first are to be accounted for by the death of Vonda and Franklin and the claimed adoption of a child, or by the undue influence of proponent, was a matter of fact for the jury, not law for the court.   We recognize the rights of a wife respecting the disposition of her husband's estate and the extent to which she may go in request, counsel, entreaty and persuasion, and that she may exercise, as has been said, a "wifely influence."   Surely the acts of the proponent as claimed will not be so classed as a matter of law.   Language used in *Re Loree's Estate*, 158 Mich. 372, is applicable here:

"Counsel for proponent put great reliance upon cases where the courts have held that the wife may exercise certain influence over the husband in the matter of the disposition of his property, even to the point of argument and persistent urging.   An examination of such cases discloses that the influence exercised was from a proper motive, and with a proper purpose. We are referred to no case like the case at bar, and we are unable to find any such case where the motive was a revengeful one, and the purpose to wrongfully injure those who, in fact, were innocent of any wrongdoing."

The elements of undue influence to make the issue under the facts as claimed by contestants, above reviewed, are:

(*a*) That the testator was weakened physically and to some extent mentally by illness and hence lacking in power of resistance to the influence exerted by proponent.

(*b*) Discrepancy between the will and testator's declared intention.

(c) Creating a false impression in the mind of the testator that his daughter was not in need of his bounty.

(d) Proponent's influence over and control of the testator respecting his property and as against the children of his first wife, and her wrongful and unjust attitude toward them.

(e) The opportunity of the wife to exercise undue influence.

(f) Testator's declarations respecting the proponent as indicating his state of mind toward her.

(g) The threat, conduct and statements of proponent respecting the disposition of the estate.

(h) Inequality of distribution.

(i) Other declarations of the testator respecting the will made soon after its execution as showing undue influence, and at other times as showing his state of mind.

(j) The general relations of the parties.

These elements taken and considered collectively made an issue of fact upon this question. See 40 Cyc. pp. 1142, 1167, 1170, and cases there cited; *In re Hillman's Estate, supra.* And compare evidence here reviewed with that set forth in *Walts* v. *Walts,* 127 Mich. 611, and *In re Loree's Estate, supra,* in which cases it was held that an issue of fact had been made upon the question of undue influence exerted by a wife. See, also, *Beaubien* v. *Cicotte,* 12 Mich. 459; *In re Provin's Estate,* 161 Mich. 28.

The trial judge was right in refusing to direct a verdict.

2. The opening statement of counsel for contestants indicated that proof was intended of improper conduct and relations of proponent with one Laveque at and during the time in question, and that the same was known to testator. Objection was made to such statement. Later counsel for contestants began to interrogate a witness upon the subject and upon objection the testimony was excluded. The matter is urged as prejudicial error. Evidence of declarations,

statements and expressions of testator respecting such claimed drunkenness and infidelity was admissible upon the question of undue influence as bearing upon testator's state of mind, his feelings and attitude toward his wife. *Haines* v. *Hayden*, 95 Mich. 332 (35 Am. St. Rep. 566) ; *Beaubien* v. *Cicotte, supra; Bush* v. *Delano*, 113 Mich. 321; 40 Cyc. p. 1158; Page on Wills, p. 500. There are cases in which, as regards the mentality of a testator, evidence was admitted as to whether such state of mind, attitude and feelings were based upon fact or were delusions. We consider this question further in the next paragraph.

3. Complaint is made of the following from the charge:

"Now, concerning the evidence as to drinking and quarreling of the parties. You will recall the evidence received concerning what is claimed to be the drinking and quarrelsomeness of Mrs. Jackson. The proponent denies that she was addicted to the excessive use of liquor and claims that the parties lived ordinarily happy. The contestants claim that the proofs show that she was quarrelsome, overbearing in her conduct towards her husband and frequently became helplessly drunk, to the knowledge of Mr. Jackson. In case you shall find from the proofs that Mrs. Jackson was in fact habitually drunk and quarrelsome, as claimed, the only effect you can give to the evidence is what influence her conduct in this respect had upon the mind of Abner Jackson at the time the will was made, December 12, 1918. If he was not affected by undue influence and acted of his own volition and will, his will is not to be set aside though she had been guilty of the drunkenness and quarreling as charged; but if you find she was in fact guilty of these acts as charged then you may consider whether these or other conduct affected the terms of the will and whether the drinking and consequent quarrels, if any, together with other conduct on her part, operated to repress his will and replace it by her will and determination."

We think this reversible error.

The habitual drunkenness of the wife could not be considered as substantive evidence of undue influence. It did not operate to repress the will of testator. It was said in *McMahon* v. *Ryan*, 20 Pa. St. 329, that bad treatment of a testatrix by the beneficiary ought to be regarded as furnishing presumptions in favor of a will. It was held that insanity of the wife, the beneficiary, in itself was not evidence of undue influence. *In re Vivian's Appeal*, 74 Conn. 257 (50 Atl. 797). It is said in Gardner on Wills, p. 202:

"On the issue of undue influence, evidence of the insanity of the wife, who was alleged to have unduly influenced the testator, is inadmissible, in the absence of proof that such insanity contributed to the alleged improper influence, as is also evidence of medicines used by the testator under the same circumstances, and of a contract with the beneficiary prior to the testator's marriage with her; of the fact that others were more worthy of the testator's bounty than the beneficiaries under the will, of the penurious character of the party alleged to have unduly influenced the testator, and of the tendencies of the principal legatee to speculate in stocks."

It was held in *Re Crissick's Will*, 174 Iowa, 397 (156 N. W. 415), that evidence that the husband, the beneficiary, was a drunkard was not admissible to show undue influence exerted by him. See *In re Calkins*, 112 Cal. 296 (44 Pac. 577); *Rice* v. *Rice*, 50 Mich. 448; *In re Merriman's Appeal*, 108 Mich. 454; *Garland* v. *Smith*, 127 Mo. 567 (28 S. W. 191, 29 S. W. 836). But see *Livering's Ex'r* v. *Russell*, 30 Ky. Law Rep. 1185 (100 S. W. 841), where, upon this question, evidence of the cruelty of the husband, beneficiary, toward testatrix, his wife, was admitted. And there was a like holding in *Jennings* v. *Jennings* (Tex. Civ. App.), 212 S. W. 772.

4. There being evidence that the attitude of proponent toward testator's said children and her con-

trol over him were continuous, it may not be said that evidence admitted relating thereto was too remote. *In re Loree's Estate, supra.*

The remaining questions are not likely to arise upon a new trial.

Judgment reversed.        New trial granted.

FELLOWS, C. J., and MCDONALD and MOORE, JJ., concurred with CLARK, J.