# STATE OF MICHIGAN

# COURT OF APPEALS

---

*In re* ESTATE OF JOSEPHINE M. MICHAEL.

---

MAROUN J. HAKIM as Personal Representative
of the ESTATE OF JOSEPHINE M. MICHAEL,
and COMERICA BANK,

UNPUBLISHED
August 9, 2018

Petitioners,

and

CHARLES MICHAEL,

Appellee,

v

No. 337161
Macomb Probate Court
LC No. 2015-215342-DA

RICHARD MICHAEL,

Appellant.

---

Before: FORT HOOD, P.J., and SERVITTO and BECKERING, JJ.

PER CURIAM.

Appellant, Richard Michael, appeals as of right the probate court's determination that his mother, Josephine Michael, was unduly influenced by him, in executing a September 8, 2010 will devising her home to him to the exclusion of her other children and the probate court's order setting aside that will. We affirm.

Josephine Michael ("Josephine") passed away on January 6, 2015, at the age of 98. She had four adult sons. On January 12, 2015, attorney Maroun Hakim filed letters of authority as personal representative for her estate and requested informal probate of a will executed by Josephine on September 8, 2010. The September 8, 2010 will devised her home, which constituted the majority of her estate, solely to her son Richard Michael ("Rickey") who had resided with Josephine the majority of time from 2010 until her death. Josephine's prior wills had devised her estate equally among Rickey and her three other sons.

-1-

One of Josephine's sons, Charles Michael ("Charles"), petitioned to set aside the informal probating of the will, asserting that he was contesting the validity of the September 8, 2010 will based upon duress, coercion and undue influence exercised by Rickey over Josephine. The matter proceeded to a bench trial, at the conclusion of which the probate court found that the September 8, 2010 will was procured through the undue influence of Rickey. The probate court thus set aside the September 8, 2010 will. Rickey now appeals that determination, arguing that the evidence presented at the bench trial was insufficient to establish that he controlled or overcame his mother to the point of forcing her to abide by his will.

"Following a bench trial, we review for clear error the trial court's factual findings and review de novo its conclusions of law." *Ligon v City of Detroit*, 276 Mich App 120, 124; 739 NW2d 900 (2007). "The clear error standard provides that factual findings are clearly erroneous where there is no evidentiary support for them or where there is supporting evidence but the reviewing court is nevertheless left with a definite and firm conviction that the trial court made a mistake." *Hill v City of Warren*, 276 Mich App 299, 308; 740 NW2d 706 (2007).

The right to contest a will is statutory and a "contestant of a will has the burden of establishing lack of testamentary intent or capacity, undue influence, fraud, duress, mistake, or revocation." MCL 700.3407(1)(c). "To establish undue influence it must be shown that the grantor was subjected to threats, misrepresentation, undue flattery, fraud, or physical or moral coercion sufficient to overpower volition, destroy free agency and impel the grantor to act against his inclination and free will." *In re Estate of Karmey*, 468 Mich 68, 75; 658 NW2d 796 (2003) (quoting *Kar v Hogan*, 399 Mich 529, 537; 251 NW2d 77 (1976)). There must be proof of actual acts of the type illustrated above to establish undue influence; "motive, opportunity, or even ability to control, in the absence of affirmative evidence that it was exercised, are not sufficient." *Id*. To be classed as "undue influence" the influence must place the testator in the attitude of saying: "It is not my will but I must do it." *In re Jackson's Estate*, 220 Mich 565, 574; 190 NW 762 (1922).

In some instances, undue influence is presumed. A presumption of undue influence is created by the introduction of evidence that establishes "(1) the existence of a confidential or fiduciary relationship between the grantor and a fiduciary, (2) the fiduciary or an interest which he represents benefits from a transaction, and (3) the fiduciary had an opportunity to influence the grantor's decision in that transaction." *Kar*, 399 Mich at 537. Even when this presumption is established, the ultimate burden of proving undue influence remains on the party alleging that it occurred. *Id*. at 538. What the presumption does is satisfy the burden of persuasion, so if a party opposing the allegation of undue influence "fails to offer sufficient rebuttal evidence," then the party alleging undue influence will have met its burden of showing the occurrence of undue influence. *Id*. at 542. The trier of fact must resolve whether sufficient evidence has been presented to rebut a presumption of undue influence. *In re Peterson Estate*, 193 Mich App 257, 262; 483 NW2d 624 (1992). [1] "The reviewing court will defer to the probate court on

---

[1] Although not addressed by the trial court, as an alternative reason to affirm we would find that all of the factors necessary to establish a presumption of undue influence have been met, *Kar*,

matters of credibility, and will give broad deference to findings made by the probate court because of its unique vantage point regarding witnesses, their testimony, and other influencing factors not readily available to the reviewing court." *In re Erickson Estate*, 202 Mich App 329, 331; 508 NW2d 181 (1993); see also MCR 2.613(C).

In this matter, there was an abundance of evidence indicating that Rickey exercised control over Josephine and subjected her to threats, misrepresentation, and coercion sufficient to overpower her volition and impel Josephine to act against her inclination and free will in signing the September 8, 2010 will. *Karmey*, 468 Mich at 75. First, several witnesses testified that Rickey would frequently yell at his mother and would often tell her that he was the only one who loved her, that she loved the other sons and her niece more than she loved him, that everyone else would put her in a nursing home, or that he would put her in a nursing home.

Judy Hicks ("Hicks"), employed as a caregiver for Josephine in 2009-2010, testified that during the time she cared for Josephine, Rickey would often argue with his mother and would ask other family members to leave when they came to visit Josephine. Hicks further testified that she often heard Rickey tell Josephine that he was the only one that would take care of her and that everyone else would put her in a home. Hicks detailed a day, September 9, 2010, when Josephine was crying, which was highly unusual. According to Hicks, Josephine told her that Rickey had tricked her into signing her house over to him and that Rickey told her if she did not sign a new will he would not take care of her anymore. Hicks testified that Josephine feared going into a nursing home facility.

Rodney Michael ("Rodney"), one of Josephine's sons, testified that he saw several arguments between Rickey and their mother and, on one occasion, saw Rickey scream at their mother that he was the only one who loved her. On one occasion, when Rickey wanted Rodney to leave the house and he refused, Rickey put his head in Josephine's lap crying and telling her that she loved Rodney more. Rodney testified that on another occasion (he could not recall the year) Josephine called him upset about something Rickey made her do. Josephine told Rodney that instead of taking her to eat, Rickey had taken her to attorney Hakim's office. Josephine said she thought Rickey was going to put her in a nursing home and Rodney would not find her.

George Michael ("George"), another of Josephine's sons, testified that Rickey and their mother frequently argued and that Josephine kicked Rickey out of her house several times. George saw many arguments between Rickey and their mother and heard Rickey tell their mother on several occasions that he was the only one that would take care of her and that the other boys would just put her in a nursing home.

Anita Abdoo, Josephine's niece and neighbor, testified that Josephine was like a mother to her and that she saw Josephine daily except during a three-year period when Abdoo lived elsewhere, when she saw Josephine two to three times a week. Abdoo testified that Rickey

399 Mich at 537, and that Rickey failed to offer sufficient rebuttal evidence such that Charles met his burden of showing undue influence. *Id.* at 542.

would yell at Josephine and tell her that the other brothers would put her in a nursing home, which terrified Josephine.

Dolores Eggen, Josephine's 80-year-old niece, testified that she spoke to Josephine daily and saw her every Sunday in church. Eggen testified that around 2010 Josephine was crying and told Eggen that she signed some papers because she was fearful that Rickey was going to put her in a nursing home.

Cynthia Keener, Josephine's niece and neighbor from 2006-2013, testified that she saw Josephine a couple of times per week. She testified that there was a lot of fighting between Rickey and Josephine and that she heard Rickey tell Josephine that his brothers were trying to put her in a nursing home, that they did not love her, and that Rickey was the only one who loved her.

Charles Michael ("Charles"), the fourth of Josephine's sons, testified that his mother expressed fear of Rickey putting her into a nursing home. While Charles was on the phone with their mother on one occasion, he heard Rickey tell her that if he was not in the home, his brothers would put her in a nursing home and she was lucky Rickey was there to care for her. On another occasion while on the phone with their mother, Charles heard Rickey yelling at their mother that he (Rickey) was going to put her in a nursing home.

From the above, it is clear that Josephine and Rickey had a contentious and emotional relationship. Rickey engaged in considerable emotional manipulation of Josephine by alternatively intimidating her through yelling and threatening to put her in a nursing home, and then wheedling her into letting him have his way by telling her he was the only one who loved her and would keep her out of a nursing home. The testimony establishes that he used these threats and manipulation to get Josephine to sign the September 8, 2010 will. Though Rickey testified that he did not yell at his mother and that Hicks, Abdoo, Rodney and Keener were all lying when they said otherwise, the probate court obviously found these witnesses to be more credible. We will not interfere with the trier of fact's role in determining the credibility of the witnesses. *People v Williams*, 268 Mich App 416, 419; 707 NW2d 624 (2005).

Second, Rickey isolated and controlled Josephine and caused her to distrust others. Rodney testified that for a period several years prior to Josephine's death, every time Rodney would go to visit his mother, Rickey would tell him to leave or call the police. Rodney testified that Rickey threatened him with a gun when he came to see Josephine in 2010 or 2012. He had a gun in his hand and told Rodney he couldn't be there and that he would kill him.

Abdoo testified that Rickey would yell at Josephine until she did not want to go anywhere. Abdoo would be on the phone with Josephine and she could hear Rickey asking who she was talking to and demanding she get off the phone. Rickey would also call when Abdoo was at Josephine's house and tell her to make Abdoo leave. Rickey eventually moved the phones in the house so that they were not near Josephine anymore when she was not able to get up on her own easily to go get the phone. In addition, according to Abdoo, Rickey did not go to family functions and did not want Josephine to go either, demanding that others bring her home from events when he called.

Eggen testified that Rickey tried to control who Josephine could see and that Josephine told her that Rickey bossed Josephine around. Keener testified that she was not allowed to be at Josephine's house a lot of times when Rickey was there. She further testified that Rickey would get angry and yell or cuss at Josephine for wanting to go out with Charles or Abdoo.

Charles testified that Rickey wanted to control Josephine. Rickey began arguing with Charles when he came in the evenings to visit Josephine and he told Charles to come during the day, while Rickey was at work. Charles, thereafter, couldn't come as often because he worked during the day as well. If Rickey called when he was visiting Josephine, Charles could hear Rickey tell their mother that Charles better not be there when he got home. Rickey would often throw Josephine's visitors, who consisted primarily of family, out of the home. George similarly testified that Rickey tried to control who came to Josephine's house and stopped their cousin, Abdoo, and others from coming to see Josephine.

As for causing Josephine to distrust others, in late 2009 and early 2010, Rodney transferred money between Josephine's accounts in order to pay caregiver and other expenses for her. Without investigating or speaking to his brother, Rickey testified that he told Josephine that he believed Rodney and Abdoo were taking money out of her accounts. Rickey thus made Josephine suspicious of Rodney and Abdoo in an attempt to have her place her trust and faith only in him.

By limiting the people Josephine was exposed to or allowed to speak to, Rickey ensured that he was the significant influence over Josephine. By yelling at her and making things difficult for her to visit others, he made sure Josephine was dependent on him for her transportation and well-being, and by making her suspicious of her sons and the niece that was like a daughter to her, Rickey attempted to ensure that she looked to only him as trustworthy and the one who looked out for her.

Third, Rickey took advantage of Josephine's dementia and age. Evidence was presented that Josephine was diagnosed with dementia by a physician in 2009 and severe dementia in August 2010. George testified that Josephine required live in help because she had dementia. She forgot things and required a calendar, which she looked at many times daily, to keep track of events. George testified that he first noticed Josephine's memory issues in 2008 when she got lost driving home from her regular church and that her short term memory went very quickly. George also testified that sometime around 2009 Josephine's dementia got bad enough where he could talk to her and 30 seconds later she would not remember you were talking to her; she would just drift off. George testified that Josephine said on many occasions that she loved all four boys and wanted whatever she had split evenly when she died.

Abdoo testified that she noticed problems with Josephine's memory starting 2008 when Josephine got lost driving home from her regular church. Abdoo testified that she had gone to the doctor with Josephine and that Josephine's doctor was going to prescribe a medication for dementia but the side effects would adversely affect her asthma. According to Abdoo, Josephine told her that she wanted all four of her boys to have equal shares of her estate. Josephine was always adamant that she had a will with all four boys' names in it and that Rickey could buy the other three boys out of their shares of the house. Abdoo testified that up until the time she passed away, Josephine thought everything was going to be divided four ways.

Rodney testified that after 2008, he noticed that Josephine was "kind of losing it." She was repeating everything and would keep him on the phone for hours saying the same things over and over.

Eggen similarly testified that at some point she noticed that Josephine kept repeating herself and that her recent memory was not good. Josephine would have difficulty at times remembering how to count the dice during games with their friends. Josephine would talk to Eggen frequently about making a will and how she wanted everything to be divided between her boys. Every time someone would pass away, both before and after 2010, Josephine would bring it up again to Eggen.

Keener testified that after Josephine stopped working around 2004 or 2005 she began to get forgetful. Keener got a call from the police one day because Josephine was lost. Josephine's memory loss progressed greatly over the years and, according to Keener, deteriorated to the point where she did not know her grandchildren and would forgot if she ate. Keener testified that after 2010 Josephine discussed dying a lot and told Keener that she had a will to make sure all four boys split the house and if Rickey wanted it, he had to buy his brothers out.

Charles testified that he started to notice his mother's dementia around 2007 when she started repeating herself a lot. As time went along, it got worse and worse and she was confused a lot about a lot of things.

Rickey, interestingly, testified that he did not notice a decline in his mother's mental health until July 2014. However, he also obtained a power of attorney over her financial matters in 2010. Rickey also chose to not discuss important matters with Josephine because she was "tired" or "under stress." He therefore used her age, weakened condition, and dementia when it suited his interests, including engaging in some highly suspicious self-dealing transactions which, as the probate court noted, seriously damaged his credibility.

Using the 2010 power of attorney he obtained over Josephine's financial matters, Rickey signed a promissory note on behalf of his mother in 2013 whereby his mother promised to pay him $50,000. He also signed a mortgage on his mother's house in his favor for $50,000. Rickey did not go over the amounts with his mother or tell her he was signing a mortgage on her behalf although she was, according to Rickey, competent and alert at that time. In order to have an attorney draft the promissory note and mortgage, Rickey provided the attorney with, among other things, the physician's statement that Josephine suffered from dementia. Rickey testified that he did not tell Josephine about the note and mortgage because he did not want to bother her with such things.

Rickey testified that the promissory note and mortgage were for things he had paid for on behalf of his mother for which she had told him she would repay him. These items dated back into the 1990's, were not well documented and were, as observed by the probate court, likely intended as gifts. They included payments for some utility bills Rickey paid while he was living with Josephine, rent-free, meals he had purchased for his mother, and plumbing repairs on the

home. Rickey made a claim against Josephine's estate for approximately $53,000 for expenses for the care of Josephine and payment of the mortgage.[2] The fact that Rickey would place a mortgage on the house in his own favor for things he had done for his mother over a 20 year period and then make a claim against her estate for over $53,000 serves as significant evidence that Rickey intended to do whatever it took to ensure that he and he alone received the house.

Rickey cites to *In re Jennings' Estate*, 335 Mich 241; 55 NW2d 812 (1952) as support for his position that there was no undue influence exercised over his mother. In that case, however, the proof given to establish undue influence focused primarily on what the challenger of the will did for the deceased and a few statements made by the deceased. Here, in contrast, the trial court focused on Rickey's actions and Josephine's reactions to him, as well as her statements to others.

Rickey also cites to *In re Hoffman's Estate*, 300 Mich 406; 2 NW2d 442 (1942) where a grandson objected to the revocation of his grandmother's will providing for him, that had been executed a short time before her death. The grandson asserted that his father had exerted undue influence over the grandmother to have her revoke the will. The bulk of the evidence relied upon by the grandson was statements made by the grandmother in letters to him about the behavior of the father, which she did not necessarily approve of and the fact that he had little to say to her. Evidence was also introduced that the revocation was executed when the grandmother was bedridden and was made at the direction of the father. Here again, the focus was not so much on what the father actually did to allegedly unduly influence the grandmother but on the grandmother's feelings about certain actions and attributes of the father.

Here, in contrast, a host of witnesses testified that Rickey yelled at his mother, often stated that he would put her in a nursing home, of which she was deathly afraid, and played upon her emotions. Rickey did present witnesses on his behalf, who testified that he was a loving son, which he undoubtedly was, at times. It is notable, however, that two of Rickey's three witnesses saw Josephine only sporadically and only when she was alone with Rickey.

Ultimately, this matter came down primarily to a credibility contest, and the trial court found Rickey to not be entirely credible. "[This Court] scrupulously leave[s] questions of credibility to the trier of fact to resolve." *People v Ericksen*, 288 Mich App 192, 197; 793 NW2d 120 (2010); see also MCR 2.613(C). There were several key issues on which Rickey's trial testimony conflicted with his deposition testimony and with the testimony of others. For example, Rickey testified at trial that he did not know that the 2010 will gave him Josephine's house to the exclusion of his brothers until he received something in the mail after she died. He also testified that Josephine, however, had told him he was getting the house. Rickey also testified that his brothers did nothing for their mother for the 15 years prior to her death and that he did everything, whereas a multitude of other witnesses testified that all of Josephine's sons contributed to her well-being, financially and otherwise.

---

[2] On the last day of trial, Rickey withdrew his claims concerning the mortgage and the underlying alleged debt.

Giving due deference to the judge's ability to determine the credibility of witnesses, it is evident that Rickey subjected Josephine to threats of placing her in a nursing home, misrepresentations that he was the only son who loved her, and coercion through tears, pleas and anger sufficient to overpower Josephine's volition and impel her to act against her inclination and free will in signing the 2010 will. *In re Estate of Karmey*, 468 Mich at 75. The probate court thus properly set aside the September 2010 will.

Affirmed.


/s/ Karen M. Fort Hood
/s/ Deborah A. Servitto
/s/ Jane M. Beckering