LUIS JIMÉNEZ MONTALVO ET AL., Plaintiffs and Appellants, *v.* JOSÉ JIMÉNEZ FONT, Defendant and Appellee.

No. 11240. Argued May 11, 1954.—Decided June 17, 1954.

674

*E. Alcaraz Casablanca* for appellants. *José Sabater* for appellee.

MR. JUSTICE ORTIZ delivered the opinion of the Court.

This is a case involving a contested will executed on January 21, 1953 by María del Pilar Jiménez Font, who died on February 1, 1953 at the age of 90 years. The petition for the annulment of the will filed by some nephews of the testatrix against her brother, who was designated in the will as sole and universal heir, is based on the allegations that at the time the will was executed she was not in her sound mind, that if she was incidentally in a lucid interval when the will was executed "two physicians did not appear in the will to testify thereto, one of the witnesses being aware of the incapacity of the testatrix, to which he had sworn under oath before the Honorable Superior Court of Mayagüez, prior to the execution of the will", and that the will had been executed through deceit and fraud. After weighing the evidence, the Mayagüez Court rendered judgment dismissing the complaint. The trial court concluded that the testatrix had the necessary capacity at the time the will was executed that it was not necessary for the notary to designate, by virtue of the provisions of § 614 of the Civil Code, two physicians to examine the testatrix and attest to her capacity, and that this was not necessary because the insanity or incapacity of the testatrix had not been previously declared by any court, concluding further that there had been no fraud, deceit or violence of any kind.

The plaintiffs have appealed from the judgment to this Court and assign the following errors:

"First error: That the lower court erred in holding as it did that the notary did not have to comply with the provisions of § 614 of the Civil Code, 1930 ed.

"Second error: That the lower court erred in holding as it did that the plaintiff did not prove the testatrix's insanity at the act of Execution of the Will.

"Third error: That the lower court erred in believing the testimony of Dr. Maximiliano Almonte that the testatrix was sound at the time of executing the will.

"Fourth error: That the lower court erred in holding as it did that the will thus executed was valid."

 At the outset, we shall refer to plaintiff-appellant's allegation that the testatrix was not in her sound mind when the will was executed. It is an undisputed fact that the notary and the three attesting witnesses certified in the will that, in their opinion, the testatrix had at the time of execution the necessary legal capacity to testate and that she voluntarily had expressed her will to the notary and to the witnesses. It is stated in the will "that one of the attesting witnesses is Dr. Maximiliano Almonte, a general practitioner who is also the attending physician of the testatrix and who stated after having examined her in the presence of all that the testatrix is of sound mind and with the faculty and capacity to execute this will although she is confined to bed because of her advanced age and general weakness." It is also an undisputed fact that, as the trial court concluded, "the testatrix had never been judicially declared insane or incapable, although defendant himself had filed on November 14, 1951 a petition under No. T-1819 at the former District Court of Mayagüez praying for a declaration of incapacity of the testatrix and the appointment of a guardian to govern her person and administer her property. That proceeding was abandoned, even after a hearing was held on November 21, 1951, because the moving party had shown no interest in bringing it to an end."

It is necessary to make a brief summary of the evidence introduced, with respect to the question of the alleged mental incapacity of the testatrix.

Plaintiffs' first witness, María Matilde Marty Jiménez, testified that she was a niece of the testatrix, Doña María del Pilar, that she had visited her aunt several times in the late days of her life, when she was in bed, but that she could not speak to her because defendant prevented it, that on one occasion her aunt was lying on the floor, early in January 1953, that "the mattress was torn to pieces", that the testatrix had no hair because it had been cropped, that prior to her last illness the testatrix was always walking along the streets, that in many occasions she spoke a lot of nonsense and trivialities and had delusion of poisoning and accused "everybody" of trying to poison her, and she kept saying that "Pepe's children" had robbed her of all her jewelry, but the witness explained that as a matter of fact Pepe's children had the jewelry since long ago, that the testatrix said "that she was threatened, that they wanted to take from her all she had and that they wanted to poison her," that "she could not live with Pepe because Pepe threatened her so that she would give him all her money," that Pepe is defendant José Jiménez Font.

Plaintiff's witness, William Cordero, testified that he had known María del Pilar for about 20 to 25 years, that a year or a year and a half before the trial, he started a construction for her as a contractor, that he did not finish the project because they could not reach an agreement as to the second part of the contract "because she believed he was asking for more than the work was worth", that they had made no contract whatever, that when the witness began to work on the foundations, she spoke with two or three other contractors and "she found somebody who could do it cheaper and he stopped work," that for the purpose of signing the contract she and the witness visited several attorneys that they did not sign the contract because the witness required an advanced

payment and she refused, since she believed that the witness was asking for more money than the construction was worth, that she refused to make any advanced payment to the witness, but insisted on paying him as the work progressed. Incidentally, this witness' testimony only shows that the testatrix had an adequate degree of mental capacity to protect her interests.

Plaintiff's witness, Vicente Guardiola, testified that he is a fireman and that he had known Doña María del Pilar for more than 15 years, that she spoke with the firemen and told them that "when she died she was going to leave her inheritance to the firemen," that she crossed the street without minding the cars and when somebody would try to help her she refused. That on one occasion the witness tried to help her and she told him "don't touch me, I do not want men to touch me," and that at that time she was over 85 years of age. On cross-examination the witness testified that the street crossing incident between them took place about three years before July 21, 1953, the date of the trial.

Plaintiff's witness, Armando Y. Cifre, testified that he saw Doña María del Pilar at court when evidence was presented in a petition for her incapacity (November 21, 1951) and that then she said "that she did not want to stay there because the judge and the others present wanted to frame her," that she wanted to leave because "they want to declare me insane. Even Pepe wants to declare me insane" and that then she left.

Juan Jiménez Figueroa, testatrix's nephew, testified that he saw the testatrix during the last days of her life and that it was difficult to understand what she said, that she complained but it was because of some bruises that she had received. It seemed that they became infected and she complained of pains; her legs and hands were swollen.

The aforesaid testimony of witnesses who testified as to the acts, expressions and physical condition of the testatrix were not sufficient to show that the testatrix was mentally

incapable or that she was not in her sound mind when the will was executed. Their testimony characterizes her as a woman of advanced age with the weakness and ailments inherent in that age, but still with sufficient judgment to protect her interests up to a certain extent. She exhibited certain eccentricities, but as we held in *Ortiz* v. *Bermúdez*, 70 P.R.R. 674, 679, eccentricity is not a synonym of mental insanity and insanity must not be mistaken for the mere peculiar or eccentric character of the testator.

■■ The real problem in the instant case refers to the expert testimony of both parties who testified in this case and to the weight given by the trial court to such testimony. Drs. Pablo Guardiola and Andrés Augusto Rodríguez García testified for plaintiff and Dr. Maximiliano Almonte testified for defendant.

Plaintiff's expert, Dr. Pablo Guardiola, testified in brief as follows: He saw Doña María del Pilar on several occasions during the last three years prior to her death, and on the last month of her illness he saw her three or four times; she "had a bad case of dandruff, a rash in the scalp"; this disease frequently attacks old people; the last time he saw her was about 10 days before she died; when he saw her last she was suffering from the same condition as on August 1952, that is, she had "senile psychosis" which is known as dementia senile; it is a state of abnormality; senile psychosis is not curable, it is progressive; it is due to circulatory changes in the cerebral cortex, which produce cerebral decay; those circulatory changes are attributed to the onset of old age; in this case they were produced by age; she had skin ulcers; in the death certificate the doctor attributed her death to arteriosclerosis and to a state of toxemia; during the month that he assisted her she was totally distracted; she answered the witness' questions irrationally; "a person who suffers from senile psychosis, in my opinion, has no capacity to make transactions"; senile psychosis has lucid intervals at an early stage; when an advanced stage of senile psychosis is reached

a person seldom has periods of sanity; she "was in an advanced stage of senility . . . she was at the toxic stage of an infection of her side, which is an aggravant"; the witness could not answer whether she had lucid periods, "because a person would have to be with her 24 hours of the day in order to observe her"; normally those persons have lucid intervals; at the time the witness saw her she was never lucid; she did not speak clearly; it was hard to understand what she said, "one had to speak close to her ear and raise one's voice in order that she could hear." On cross-examination he was asked whether he had seen her on January 21, 1953, the date of the will, and the witness answered that he does not know when she made the will. Asked by the Court, he testified that he can not exclude the possibility of a lucid interval "because it is always possible in those cases"; senile insanity has a number of characteristics, sometimes the patient does not remember recent facts, but remembers remote incidents; she remembered remote but not recent facts; a person may lose his memory because of a strong impression; the characteristics which she exhibited coincided in all the last visits the doctor paid her; toxic state and insanity are mistaken; a person may lose his memory without losing the mind; Doña María del Pilar was crazy, insane, when the witness saw her; senile dementia is progressive and could admit lucid intervals, but this is not probable; the witness reached his conclusions as a result of both cases, senile dementia and the infection.

Dr. Andrés Augusto Rodríguez García testified as witness for the plaintiff that he had visited Doña María del Pilar late in the year 1951, that "a mental examination revealed a patient with symptoms very similar to, if not identical with, those of a patient with moderate insanity," and that senile dementia is progressive and becomes worse with the lapse of time.

Defendant presented Dr. Maximiliano Almonte as his witness and expert. Dr. Almonte was witness at the will

and stated that the testatrix, upon making the will, was of sound mind and with faculty and capacity to execute the will. He testified to the following:

He had known Doña María del Pilar for the last four years; on January 21, 1953 he was a witness in the will, he was personally present and so was she; Mr. José Sabater, the attorney, read the will and she said that she accepted it and that she consented and signed the will in the presence of the witness and of the other witnesses; the witness could talk to her and she spoke clearly, naturally; she was lucid "in all that he spoke to her"; "she spoke to us and her mind was completely clear"; she had full capacity to do what she was doing; the notary told her that he came to make the will and that her heir was her brother, José Jiménez Font, and she said that it was all right; that the witness visited her on many occasions and that he never noticed a state of confusion; he visited her during the two or three weeks prior to her death and she asked him about his whole family; the defendant was never present when the will was made; that he was never able to notice a subnormal state in her and that he always considered her competent.

On cross-examination the plaintiff asked the witness extensively regarding his testimony in an incapacity proceeding brought by the defendant against Doña María del Pilar, in order to prove that in that proceeding, on November 21, 1951, the witness had made statements which were in contradiction with his testimony at the trial in the instant case. In the former proceeding the witness had testified in brief to the following:

She has a subnormal mental state because of her senility, "she is more than 80 or 88 years old. Physically, I think she is all right, but mentally . . . I consider her incapable of making any transaction because of the subnormal mental state . . . but she is not insane." It is a senile, subnormal mental state, but she is not insane. "Her physical condition is a form of incapacity, it is a type of insanity, senile demen-

tia." It is an insanity caused exclusively by her old age, "but I would not declare her insane, I would declare her incapable because of her senility, her subnormal state." Senility affects a person's brains and it is progressive; the witness would not go into any money transaction with her because of her senility; but she is lucid; "during the hours that I have treated her during the day she has been completely lucid"; she is not an idiot, imbecile or moron; she knows how to defend herself; she can not make good business deals; the witness insists that he "can not declare her insane," her state is subnormal because of her senility, but she is not crazy; "her mind is unbalanced and she can not appreciate many facts of her life precisely because of her mental state, but "she is definitively not crazy, it is a subnormal mental state. That is my point of view, but it is progressing and with the onset of old age insanity will result . . . but up to now, it is a subnormal mental state." He believes she is incapable of administering her property from that point of view; in her conversation she conducts herself as a normal person.

Upon examining and interrogating him concerning his testimony at the hearing of this case, the witness stated that because of her inherent physical and organic incapacity, she was suffering from senile dementia, but that it was not a state of confusion, and he said the following: "I remember that I said incapable from the organic point of view, because of her age, but I testified that whenever I had the opportunity to see her she was completely lucid. I was referring to her advanced age. An organic, not a mental state."

The former testimony of Dr. Almonte is somewhat confusing and apparently there were some contradictions between both testimonies. But this notwithstanding, the trial court in the case at bar gave full weight and credence to the testimony of Dr. Almonte in the instant case, as to his information that the testatrix was mentally capable when the will was executed. The trial court, in its finding of fact that she

was of sound mind when the will was executed decided to accept and grant preference to the opinion of Dr. Almonte as to the sufficient mental capacity of the testatrix when executing the will. In its findings the trial court stated:

"If the plaintiffs pretend to rely on the presumption of a continued mental state described by Dr. Guardiola shortly before the testatrix executed the contested will, . . . we conclude that any presumption to that effect was destroyed by Dr. Maximiliano Almonte's testimony at the trial and by the testimony of that witness, of the subscribing attorney and of other witnesses to the will, to the effect that when it was executed, the testator had the necessary capacity to testate."

The apparent contradictions in the testimonies of Dr. Almonte may be explained by virtue of the theory that we shall hereafter discuss, that previous senility is not inconsistent with the fact that the testatrix had sufficient mental capacity when the will was executed. That was the theory of the trial court.

We have elaborated on the testimony of the medical experts of both parties because such testimony constitutes the vital nerve of the question raised by the appellants to the effect that the Mayagüez Court erred in concluding that the testatrix was of sound mind when the will was executed, and in giving entire credit to Dr. Maximiliano Almonte. It is necessary in order to decide this suit, to set the limits and barriers of the power of review of this Court, when the judgment of the trial court has been based on a determination of the weight, credibility and effectiveness of the testimony of the experts. In the case of *Wolff* v. *Hernández, ante,* p. 608, we indicated that there was a line of United States authorities who had expressed their views as to the definite character of a judgment based exclusively on the resolution of a conflict of opinions among experts. In Puerto Rico the scope and ambit of the power of this Court to review or set aside the findings of a court of first instance are definite and conditioned by Rule 52 (*a*) of the Rule of Civil Procedure, stating

that the findings based on oral testimony shall not be set aside unless clearly erroneous. Rule 52 (*a*) is applicable to findings of facts based on the testimony of experts. *Graver Tank & Mfg. Co. Inc.*, v. *Linde Air Products Co.*, 336 U. S. 271, 274, 275; 339 U. S. 605, 611; *Hazeltine Research* v. *Admiral Corp.*, 183 F.2d 953; *O'Brien* v. *O'Brien*, (1953) 202 F.2d 254, 256; *Iriarte* v. *United States*, 157 F.2d 105, First Circuit, concerning conflicts in the opinion of experts as to the assessment of property. The requirement that the error be clearly shown is particularly applicable to cases involving the testimony of experts and their familiarity with specific scientific problems and principles not usually contained in the general storehouse of knowledge and experience. *Graver Co.* v. *Linde Co.*, 339 U. S. 605, 610. In order to set aside findings stemming from the testimony of experts, there must be a very obvious and exceptional showing of error. *Graver Co.* v. *Linde Co.*, 336 U. S. 271, 275. It must be shown that an error has been clearly committed in judging the opinions of experts. *Jeoffroy Mfg. Co.* v. *Graham*, (1953) 206 F.2d 772; *Porter-Cable Machine Co.* v. *Knives and Saws Inc.*, 204 F.2d 21, 23, 24; *Mach Co.* v. *General Motors Corp.*, (1953) 207 F.2d 42, 45: "It is not our function, but rather that of the District Court, to determine the probative value of the tests conducted by the expert." In order to show that the finding is clearly erroneous the appellate court must have a definite and firm conviction that a mistake has been committed. *U. S.* v. *Oregon State Medical Society*, 343 U. S. 326; *U. S.* v. *Gypsum Co.*, 333 U. S. 364. The finding would be clearly erroneous if it were against the clear weight of the evidence (*U. S.* v. *State Street Trust Co.*, First Circuit, 124 F.2d 948; *Fleming* v. *Palmer*, 123 F.2d 749) and should only be set aside if not supported by substantial evidence. *Corbett* v. *Hallowell*, 123 F.2d 331. Especially when deciding a conflict in the opinion of experts, the finding of the trial court may not be disturbed unless they can not be sustained upon any rational view, (*Shapiro* v.

*Rubens*, 166 F.2d 659) or are not inherently plausible. In a case such as this one, this Court not only has not seen the person whose capacity is at issue but it has not seen the experts who, in turn, have directly observed that person. A relevant factor in the decision of the court of first instance as to conflicts in the testimony of experts, is not only the scientific validity of the opinion itself but the impact on the trial court as to the sincerity, persuasiveness and personality of the expert. Those intangible elements may not be adequately grasped by the appellate court.

The Supreme Court of Spain has already decided that the question concerning the mental capacity of a testator is a question of fact to be decided primarily by the court of first instance. It is preeminently a trial court's function to weigh and evaluate the opinion of the experts as to that particular. Judgments of the Supreme Court of Spain of April 10, 1944, January 12, 1927; May 8, 1909 and May 18, 1933. See also Castán *Derecho Civil Español*, Vol. 4, p. 264, 6th revised ed.; Scaevola, Vol. 12, p. 106, 2nd edition.

In the case at bar we have not been shown that the trial court has clearly erred in concluding that the testatrix was of sound mind when the will was executed. We are not firmly convinced that the Mayagüez Court is mistaken; its judgment is not devoid of substantial basis in the evidence and is not contrary to the clear weight of the evidence. The opinions of Dr. Almonte have a rational basis and inherently do not lack verisimilitude.

The scope of our power to review is measured and defined by a presumption in favor of the findings of the trial court. This presumption has not been rebutted. There are, besides, other considerations which warrant the judgment appealed from. The capacity of the testator should be gauged by his condition at the time will was executed. Section 615 of the Civil Code; *Ortiz* v. *Bermúdez, supra*. The testimony of Dr. Almonte is based precisely on his observation of the testatrix at the time the will was executed.

Furthermore, in the will itself the notary authorizing it as well as the witnesses, including a doctor, certified that the testatrix was of sound mind when the will was executed. Such statements contained in the will give rise to the presumption in favor of the mental capacity of the testatrix, a presumption which had to be rebutted by very strong and convincing evidence. Judgment of April 10, 1944 of the Supreme Court of Spain; Scaevola, *op. cit.* p. 108; Castán, *op. cit.*, p. 266, citing the Judgment of December 29, 1927 of the Supreme Court of Spain; Manresa, Vol. 5, p. 360, 6th edition corrected and enlarged.

We subscribe to the doctrine laid down by the Supreme Court of Spain, on April 10, 1944, in an opinion delivered by Don José Castán Tobeñas, as follows:

"Considering that in due application of the provisions of § § 662, 663, 666 and 695 in its last paragraph, of the Civil Code, the jurisprudence of this court has proclaimed: (*a*) That the mental capacity of the testator is presumed unless destroyed by conclusive evidence to the contrary. (*b*) That the determination of that capacity has to be made with reference to the time the will is executed. (*c*) That although the notary's averment as to the capacity of the testator may be destroyed by further evidence showing that the testator is not of sound mind, at the time of executing the will, it is required that such evidence be strong and convincing since the notarial affirmation is clothed with a special character of truth. (*d*) That because the soundness of mind of the testator is a finding of fact, its determination rests with the Courts of first instance."

The presumption of mental soundness generally prevails and such presumption is applicable to the capacity of a testator. Manresa, *op. cit.*, pp. 351, 360; Judgments of the Supreme Court of Spain of May 20, 1911: "the contrary must be firmly established." April 18, 1916; November 16, 1918; April 30, 1920; May 8, 1922; "mental sanity as to the right to testate is a '*juris tantum*' presumption which may only be destroyed by clear and complete evidence to the contrary"; December 7, 1927 and October 25, 1928.

 It could be alleged that in the instant case the presumption of mental capacity was rebutted by the testimony of Dr. Guardiola, to the effect that the testatrix was suffering from senile dementia. As indicated in an annotation of 168 A.L.R. 991, the burden resting on the contestants of proving mental incompetency may not be met by evidence of incompetency at a previous or subsequent time, of a temporary, intermittent or occasional incompetency, but by evidence of incompetency of a habitual, continuous, and chronic nature. Even assuming, that as a technical matter, the proof of senility has set aside the presumption of capacity, as a presumption, still the trial court concluded that as a matter of fact, even in the absence of the presumption, and even assuming that the testatrix had already begun to suffer from senility, when the will was executed she was in her sound mind. Senile dementia is not inconsistent with mental capacity at some stages of the development of the disease. It is often a result of old age, of the inexorable march of time which tends to deteriorate the organism physically. Although senile dementia is progressive it produces mental incapacity at certain advanced stages of the disease, but in the intermediate stages, as we shall see hereafter, there may be an adequate mental capacity. In the instant case Dr. Guardiola stated that the testatrix was already in an advanced stage of senility. But the trial court rather accepted the opinion of Dr. Almonte that, when the will was executed, she was mentally competent. We find no basis in the record to set aside that finding of the trial court.

 Old age is insufficient to show mental incapacity. Castán, *op. cit.*, p. 266; Manresa, *op. cit.*, p. 358. The Supreme Court of Spain in its Judgment of October 25, 1928, Vol. 185, *Jurisprudencia Civil* 532, 545, holds that a will may not be annulled because of the senility of the testator, since neither law nor medicine admits that because of the sole fact of reaching senility, the equivalent of old age, a person should be regarded as insane. Senility is a physiologic state in the

majority of cases, and insanity is a specific and pathologic state; senility is not a disease which impairs the mental condition enough to create persons of unsound mind. (See also, Scaevola, *op. cit.*, p. 109.)

The opinion of the Supreme Court of Iowa, in the case of *Gates* v. *Cole*, 115 N. W. 236, has a detailed discussion of the senile dementia of a testator over 75 years old, as the alleged basis for the nullity of a will. The following is stated:

"On the question of the testator's mental capacity at the time the will was executed, the case at first blush appears to present a more difficult question; but upon careful analysis of the evidence we do not think it in reality does. It is the contention of the appellees that the evidence shows senile dementia extending over a period of several years prior to the making of the will, and, unless the evidence sufficiently sustains such contention, they have no basis for the finding of mental incapacity when the will was made, because their testimony all relates to the testator's condition some time before its execution. Before we discuss the evidence upon which the contestants rely, it will be well to note what senile dementia really is. That it differs greatly both in process and progress of decay is freely admitted by all writers on the subject. Medical observers say that it cannot be described by any positive characters; that, in its gradual advance to incompetency, it embraces a wide range of infirmity, varying from simple lapse of memory to complete inability to recognize persons or things; 'that often the mental infirmity of the aged is by no means as serious as might be supposed at first sight, and that, to use a figure of speech, the mind may be superficially rotted while it is sound at the core.' It is generally said that one of the surest symptoms of mental decay is the loss of memory; and especially in respect of names and dates; but it is fully recognized in the authorities that, while an old person may appear oblivious in such matters, his mental grasp of the relations he sustains to others and more especially to the immediate members of his family, and to others who would be the natural objects of his bounty, and of his own interest and affairs, his capacity and solid understanding may still remain firm. Failure of memory is not alone enough to create testamentary incapacity, unless

it extends so far as to be inconsistent with the 'sound and disposing mind and memory' requisite for all wills. 'Great age alone does not constitute testamentary disqualification,' and 'there is no presumption against a will because made by a man of advanced age, nor can incapacity be inferred from an enfeebled condition of mind or body.' *Horn* v. *Pullman*, 72 N. Y. 269. The law wisely sustains wills made by persons of impaired mental and bodily powers, provided it appears that the will is the uninfluenced act of the testator, and he has the requisite intelligence to comprehend the condition and extent of his property and remember the persons who would ordinarily be his beneficiaries. In *Banks* v. *Goodfellow*, L. R. 5 Q. B. 549, Chief Justice Cochburn held that, though mental power be reduced in old persons below the ordinary standard, yet, if the testamentary act is understood and appreciated in its different bearings, if the mental faculties retain enough strength to comprehend the transaction entered upon, the power to make a will remains. In other words, to constitute *senile dementia*, there must be such a failure of the mind as to deprive the testator of intelligent action. Such is the rule of our own cases, and the rule established by the great weight of authority. . . . The burden of proving such general and settled unsoundness of mind . . . . rested on the contestants. But, when such condition is once established, the presumption arises that it continues. . . .

"We have given the substance or the language of practically all of the testimony on which the contestants rely to establish *senile dementia*, and consequent incapacity. It is very noticeable that nowhere in all of their testimony is it shown that Mrs. Cole had forgotten her relations or friends, or had failed to recognize them. Nor is it shown that she was oblivious to her property rights and interests. . . . If mental incapacity can be found from such evidence, no person who has passed much beyond the meridian of life can make a testamentary disposition of his property. . ."

The doctrine laid down in *Gates* v. *Cole*, *supra*, is adopted and ratified in *In re Denison's Estate*, 162 P.2d 245, 251, where it is held that senile dementia does not necessarily result in mental incapacity to make a will, that it is progressive in nature and it must be determined whether its progress has so impaired the faculties of the testator that they fall

below the mark of legal capacity. This must be determined not alone by the nature and tendency of the disease, but by its effects in the particular case. Citing the case of *Wisner* v. *Chandler*, 147 P. 849, 852, it is stated that the fact that some symptons of senile dementia have been observed do not imply, in itself, the absence of testamentary capacity.

In the case of *Gilmer* v. *Brown*, 44 S.E.2d 16, 19, it is held that mental weakness or decay, standing alone, is not inconsistent with testamentary capacity, the latter case being one of fact. It is indicated that, as regards senile dementia, it is difficult to determine the point in its progress at which the faculties are so impaired that they fall below the standard of legal capacity. That is, even assuming the existence of senile dementia, there may be stages in the progress of the disease in which the person may possess sufficient mental capacity. To that same effect, regarding senile dementia, see *In re Torstensen's Estate*, 184 P.2d 255, where it is stated, furthermore, that whether a person has senile dementia is a question of fact to be determined by the doctors; In *Byrne* v. *Fulkerson*, 162 S. W. 171, 178, it is stated that the difficulty lies in determining the boundary line of senile dementia, there being stages of capacity and final stages of incapacity; In *Hibbard* v. *Baker*, 104 N. W. 399, 400, it is stated that no test can be applied to determine the effect of senile dementia at any particular time and in *In re Koll's Estate*, 206 N. W. 40, it is held that to constitute senile dementia in such a legal sense as to deprive one of testamentary capacity, there must be such a failure of mind as to deprive him of intelligent action, advanced age not being in itself evidence of testamentary incapacity.

Section 612 of our Civil Code provides in part that persons who permanently or temporarily are not of sound mind are not qualified to make wills. It could be argued that the expression "sound mind" requires an intelligence free from every defect or infirmity, and that a person with a certain degree of senile dementia would not be of sound

mind. Undoubtedly, in construing a statute referring to mental capacity, courts should give due consideration to the progress of medical science, as to the multiple forms and distinctions of insanity or mental abnormalities. Manresa, *op. cit.*, p. 357. Scaevola (*op. cit.*, p. 90), states that "bearing in mind the discoveries and progress made at present by medico-legal science and the recognized and unquestionable influence exercised on every branch of knowledge, no matter how extraneous they may seem . . . such interesting and transcendental problem may not be treated with the same rigor of action and from the same elementary viewpoint as did the anthropologists and legal scholars of other ages in studying the question." This notwithstanding, we must not give the term "sound mind" so exact an interpretation as to overthrow the testation and set aside a will because of any degree of mental defect or intellectual decay. Sanity being presumed, we must reach the conclusion that a person is not of sound mind if his mental sanity has been impaired to such an extent that he is not conscious of his acts and if the mental derangement has actually and positively affected or impaired the lucidity of his mind enough to render him insane. Manresa, *op. cit.*, pp. 360, 361; Scaevola, *op. cit.*, p. 91, " 'sound mind' should be identified with 'insanity' although the latter term should be given all the technical value and generic understanding which we have previously stated"; Castán, *op. cit.*, p. 265: "the gravity of the disease should be such as to exclude from the person suffering it consciousness of his own acts."

In view of the foregoing, the Mayagüez Court did not err in holding that the testatrix was of sound mind when she executed the will.

■■ Appellants allege that the will is void for failure to comply with the provisions of § 614 of the Civil Code which provides:

"Section 614.—Whenever a lunatic desires to make a will during a lucid interval, the notary shall appoint two physicians

to examine him previously, and he shall not execute it unless the latter answer for the capacity of the testator, including their opinion in the will, which shall be subscribed by the physicians besides the witnesses."

The provisions of § 614 were not fulfilled in the instant case. But it was not necessary, since § 614 is only applicable and operative when the will is executed by a lunatic judicially adjudged as such. It should be borne in mind that § 614 refers to a lunatic, in contrast with the provisions of § 611 which points out the incapacity of a person who is not in his sound mind. Section 614 refers to an exceptional situation, where a person really and objectively a lunatic is allowed to make a will during a lucid interval in the presence of and after previous examination by two physicians. Section 614 comes into play when the presumption of sanity has already been clearly and objectively rebutted. It being an exceptional case, its application should be limited to those situations where insanity has been judicially recognized. In the absence of such judicial declaration, § 634, which provides, in part that: "The notary and the witnesses shall also assure themselves that in their opinion the testator has the legal capacity required to make a will," would then be applicable.

In its Judgment of June 10, 1897 the Supreme Court of Spain held that it is clear that said Section (ours 614) refers to the lunatic adjudged as such and therefore if a person has not been adjudged incompetent it is not necesary for two physicians to appear at the execution of the will and state that the testator acted in a lucid interval. It was likewise held in the Judgment of October 25, 1901. That the case provided for in that Section (our 614) is not present if the mental incapacity of a person is not judicially declared, wherefore such person may not be regarded as in a permanent state of dementia especially since that Section imposes on the notary, by way of exception to the general rule, compliance with a special formality.

In 5 Manresa 386, 6th revised edition, the following is stated:

"Unfortunately, it frequently happens that although a person is actually incapable, incompetency is not judicially declared until much later. The Code, in § § 663 and 666, refers to the actual condition of capacity or incapacity at the time of making the will, but one can not disregard the influence that is exercised on the probable effects of the execution by the fact of whether or not incapacity has been previously declared, because while there is no such declaration, the presumption of the law is naturally in favor of the capacity of the testator, and it should be so understood unless the contrary is duly proved, since when incapacity is declared, such incapacity is presumed, unless the contrary is proved.

"Therefore, to comply with the provisions of § 665, the notary and the witnesses should not confine themselves to the fact of whether or not the incapacity has been declared. They should always ascertain the mental condition of the testator and when they particularly know or believe that the person is mentally deranged or where even without previous knowledge, they observe that at the time of executing his last will, the testator does not seem to be in a complete state of lucidness, they should require the examination by two physicians, complying with the provisions of § 665, since if it is valid even after the incapacity of the person has been declared, it shall be more so in case such incapacity is not yet declared.

"This doctrine, which seems to us rational, is contradicted by a judgment of the Supreme Court rendered on October 25, 1901, establishing that when the incapacity of a person at the time of executing his last will is not declared, the provisions of § 665 do not hold. This notwithstanding, the doctrine established in this judgment may be reconciled with the one we have just set forth in the sense that when the notary authorizing the will is not certain of the incapacity of the testator because there has been no previous declaration of incapacity and because there is no reason whatever to even doubt his mental soundness, there is no reason for obliging him to comply with the formalities provided in the aforesaid Section."

It may be inferred that it is Manresa's theory that if a notary has any reason to even doubt the mental soundness of the testator he should comply with the formalities of § 614.

But such a consideration offers an indefinite, unstable, intangible and speculative basis for requiring the examination by two medical persons. If that criterion is accepted, the tendency would be to demand the presence of the physicians in the majority of cases in order to avoid the risk of rendering the will void. That would needlessly complicate the process of making wills. The rule that the requirements of § 614 must be fulfilled when the objective and tangible basis of a previous judicial declaration of incapacity concurs, is preferable. Even assuming, without deciding, that § 614 may be applicable when the permanent dementia of the testator is public, notorious and undisputed, without judicial declaration, that circumstance is not present in the case at bar. Besides, in this case a proceeding for mental incapacity was instituted and abandoned. The fact that the proceeding commenced does not imply in itself that the testatrix is incompetent at the time of executing the will. Manresa, *op. cit.*, p. 387 and see the Judgment of the Supreme Court of Spain of October 25, 1901.

In 12 Scaevola 117, second edition, the following is stated:

"With respect to § 665 the doctrine laid down in the judgments of October 25, 1901 and January 22, 1913 is most transcendental. Those judgments hold: that the provisions of that Section are only applicable in the event that the testator is declared judicially incapable, otherwise the Section in point is § 685. Therefore, the orientation given to the aforesaid Section, implies a certain subordination to what we might term the formal aspect, so that, while it has not been judicially declared that the person who subsequently exercises the right to make a will is incompetent, compliance with the specific formalities provided by this Section is not mandatory. This shows that the Section is the proper legal remedy to reconcile the general effects of the declaration with the possibility of the incompetent person executing his last will during the lucid interval which the Section itself admits. This notwithstanding, we believe that where the mental alienation has not been judicially declared, if it actually exists, it would be most convenient and should be practically regarded as a statutory

requirement, to demand medical opinion with the same solemnity as if the incapacity had been judicially declared. Otherwise, the will might at any time be contested, if the mental disease suffered by the testator is proved, and it would be quite difficult for the interested party to establish the reality of the lucid interval, an altogether risky appreciation to be made by laymen, who can hardly prove the certainty of their opinion to that effect, lacking the support that medical opinion affords."

Of course, the fact that, as guide for the notaries, it is convenient and practical that two physicians be present where there is the probability of dementia without it having been judicially declared, does not mean that their absence shall render the will null. Convenience is one thing and the legal necessity to prevent nullity, is another.

There was no adequate evidence of any kind in the instant case that the will was executed under violence, deceit or fraud.

The judgment appealed from will be affirmed.

Mr. Justice Sifre did not participate herein.